# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) VICKI JO LEWIS, as the CO-PERSONAL REPRESENTATIVE of the ESTATE OF ISAIAH MARK LEWIS, deceased; and (2) VICKI JO LEWIS, as the CO-PERSONAL REPRESENTATIVE of the ESTATE OF ISAIAH MARK LEWIS, deceased, | ) ) ) ) ) ) ) | Case No.: CIV-19-489-R |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| (1) CITY OF EDMOND, an Oklahoma Municipal Corporation; (2) POLICE SGT. MILO BOX, individually; and (3) POLICE OFFICER DENTON SCHERMAN, individually, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

## DEFENDANTS MILO BOX'S AND DENTON SCHERMAN'S
## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

Submitted: May 3, 2021

Kathryn D. Terry, OBA # 17151
Cody J. Cooper, OBA # 31025
Phillips Murrah P.C.
101 North Robinson
Corporate Tower, 13th Floor
Oklahoma City, OK 73102
(405) 235-4100 Telephone
(405) 235-4133 Facsimile
kdterry@phillipsmurrah.com
cjcooper@phillipsmurrah.com

*Attorneys for Defendants Milo Box and Denton Scherman*

**TABLE OF CONTENTS**

I.   STATEMENT OF MATERIAL UNCONTROVERTED FACTS. . . . . . . . . . .1-10

II.  ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-24

    A.   Box and Scherman Did Not Violate Lewis' Fourth Amendment
        Rights Because Their Use of Force Was Reasonable. . . . . . . . . . . . . . 10-19

        1.   The severity of Lewis' crimes. . . . . . . . . . . . . . . . . . . . . . . . . 11-13

        2.   Lewis was actively resisting arrest and attempting to evade
            arrest by flight. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

        3.   Lewis posed an immediate threat to the safety of the
            officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-19

            a.   Lewis refused to comply with officer commands. . . . . . .14-15

            b.   Lewis' actions toward the officers were patently
               hostile. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16-18

            c.   Lewis was close to both officers when they employed
               force. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18-19

            d.   Lewis clearly manifested the intention to harm the
               officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

    B.   Lewis' Rights Were Not Clearly Established. . . . . . . . . . . . . . . . . . . 19-24

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Creighton,*
    483 U.S. 635 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bond v. City of Tahlequah,*
    981 F.3d 808 (10th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12, 19

*City of Escondido v. Emmons,*
    139 S. Ct. 500 (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Colston v. Barnhart,*
    130 F.3d 96 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22, 24

*Davenport v. Causey,*
    521 F.3d 544 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17,  22-24

*Estate of Booker v. Gomez,*
    745 F.3d 405 (10th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Estate of Coale v. Frost,*
    967 F.3d 978 (10th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11, 13, 17, 19

*Estate of Harmon v. Salt Lake City,*
    471 F. Supp. 3d 1203 (D. Utah 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Estate of Larson v. Murr,*
    511 F.3d 1255 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*Estate of Ronquillo by and through Estate of Sanchez v. City & Cty. of Denver,*
    720 Fed. Appx. 434 (10th Cir. 2017) (unpublished). . . . . . . . . . . . . . . . . . . . . . 17

*Graham v. Connor,*
    490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 19

*Hooks v. Atoki,*
    983 F.3d 1193 (10th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

*Jiron v. City of Lakewood,*
    392 F.3d 410 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Kisela v. Hughes,*
      138 S. Ct. 1148 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mitchell v. Schlabach,*
      864 F.3d 416 (6th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20-21, 24

*Pauly v. White,*
      874 F.3d 1197 (10th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . .10, 11, 14, 20, 24

*Sallenger v. Oakes,*
      473 F.3d 731 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Smith v. State,*
      1959 OK CRIM APP 120, 347 P.2d 232. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tennessee v. Garner,*
      471 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16

*Thomson v. Salt Lake County,*
      584 F.3d 1304 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 14

*Tolan v. Cotton,*
      572 U.S. 650 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19-20

*United States v. McKissick,*
      204 F.3d 1282 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*White v. Pauly (Pauly II),*
      137 S. Ct. 548 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

## **Statutes:**

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

21 O.S. § 644(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

21 O.S. § 649(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

22 O.S. § 60.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

21 O.S. §§ 1431. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

21 O.S. §1436 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

21 O.S. § 1438. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

**Rules:**

FEDERAL RULE OF CIVIL PROCEDURE 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

LCVR 56.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Defendants Milo Box and Denton Scherman, pursuant to FEDERAL RULE OF CIVIL PROCEDURE 56 and LCvR 56.1, respectfully request judgment in their favor and against Plaintiffs Vicki Jo Lewis and Troy Levet Lewis, and state:

## I.      STATEMENT OF MATERIAL UNCONTROVERTED FACTS.

1.      At 1:04 p.m. on April 29, 2019, a 911 caller reported a young man "beating up" a girl. *See* 1913 Lariat Circle 2019-30824 911 Calls, attached as Exh. 1, at 00:17, 2:10 – 2:13.

2.      The victim, Kamri Pollock, also spoke with 911 relating that her "boyfriend" (identified as 17-year-old Isaiah Lewis ("Lewis")) "just flipped out." *Id.*, at 1:05 – 1:09, 2:50 – 2:56.

3.      Lewis was approximately six feet tall and weighed 205 pounds. *See* EPD Incident Report (2019-900030824), attached as Exh. 2, at Edmond00000020.

4.      Another witness called 911 at 1:06 p.m. and reported Lewis was running nude down the street. *See* Exh.1, at 6:43; 6:55; 7:10; 7:24 – 7:33.

5.      Because Lewis had removed his clothing, officers believed he could be under the influence of an illegal substance. *See* Dep. of Michael King, attached as Exh. 3, at pp. 61:21-62:4; *see* Dep. of Milo Box, attached as Exh. 4, at p. 59:13-22; *see* Dep. of Timothy Radcliff, attached as Exh. 5, at p. 27:14-15.

6.      Dispatch described the call as a domestic disturbance. *See* Exh. 3, at pp. 33:20 – 34:1, 36:4-5.

7.      Four Edmond Police Department officers initially responded to the call involving Lewis. *See* Exh. 2, at Edmond00000045-46, 67, and 71.

1

8.    Lewis evaded officers who arrived on scene by running through yards and hiding in a wooded area nearby. He refused commands from officers to stop and get on the ground. *See* Exh. 3, at pp. 57:22-58:5, 68:12-15; *see* Exh. 5, at p. 27:4-11, 40:11-12; Dep. of Gregory Hunt, attached as Exh. 6, at pp. 31:16-18, 34:15-18.

9.    Sergeant Milo Box ("Box") and Officer Denton Scherman ("Scherman") knew from listening to the radio and reading the call notes that Lewis had physically assaulted his girlfriend, that he was actively fleeing the police and resisting arrest, and that he was naked. *See* Exh. 4, at p. 82:6-19; Dep. of Denton Scherman attached as Exh. 7, at p. 79:11-16.

10.    Box, who was in an unmarked vehicle with Scherman, thought that police could "deescalate the situation" if they arrived in an unmarked vehicle "slow rolling, not [sic] lights and sirens." *See* Exh. 4, at pp. 122:22, 182:13-16, 185:7-11. Thus, Box and Scherman responded to assist. Both officers were dressed in Edmond Police Department uniforms. *Id.*, at p. 123:17-18, 23-25.

11.    After arriving in the neighborhood, Box and Scherman spotted Lewis in a yard. *See* Exh. 4, at pp. 126:23-127:1; Exh. 7, at pp. 90:23-91:1, 21-23.

12.    Box is about six feet tall and weighs 208 pounds. *See* OU Medical Center Edmond Emergency Patient Record, attached as Exh. 8.

13.    At the time of this incident, Box had been employed with the Edmond Police Department for nineteen years, had obtained the rank of sergeant based on his experience and training, and had also been a TASER instructor for twelve – to – fourteen years. *See*

Exh. 4, at pp. 9:14-16, 19-21 and 10:4-6; Interview of Milo Box, attached as Exh. 9, at p. 10:19, 15:20-22.

14.     Officer Scherman is about five feet, nine to ten inches tall and weighs 170 pounds. *See* Interview of Denton Scherman, attached as Exh. 10, at p. 11:3.

15.     Box described Lewis as "sweating profusely," having wide eyes and clenched fists as if "ready to fight." Lewis appeared agitated and walked in a determined manner. *See* Exh. 4, at p. 127:3-16. Scherman similarly described Lewis as being agitated with clenched fists and a puffed-out chest. He was sweating and walking quickly. *See* Exh. 7, at p. 101:1-8.

16.     Box and Scherman knew Lewis was unarmed. *See* Exh. 4, at p. 90:2-4; Exh. 7, at p. 161:1-8.

17.     As they drove past Lewis, Box exited the vehicle, identified himself as an Edmond police officer, and gave Lewis multiple commands to stop and get on the ground. *See* Exh. 7, at pp. 92:13-18; 95:10-13; 99:10-20.

18.     Instead of complying, Lewis ran toward the front door of 520 Gray Fox Run. *See* Exh. 4, at p. 130:20-22.

19.     Box followed and, while still outside the home, drew his TASER. *See* Exh. 4, at pp. 130:22-25; 131:8-15; Exh. 7, at pp. 101:25-102:3.

20.     Over an hour after the initial 911 call, at approximately 2:09:38 p.m., Scherman parked the vehicle and called out over the radio the address of the home toward

which Lewis was running.[1] *See* Exh. 7, at p. 97:6-7, 11-13; Officer Page Hussey Dash Cam Video, attached as Exh. 11, at 14:09:38.

21.     520 Gray Fox Run's front door contained a large glass oval inlaid window. Lewis broke in by physically forcing himself through the glass. *See* Exh. 4, at pp. 131:19-24; 133:11-13; Exh. 7, at pp. 97:25-98:2; 11-13.

22.     Box ascertained Lewis did not live at the home after seeing him physically break into the residence. *See* Exh. 4, at pp. 131:19-24, 133:5-13.

23.     Box believed it was necessary to apprehend Lewis because he had been involved in a domestic disturbance, evaded police, and resisted arrest. *See* Exh. 4, at p. 132:1-9.

24.     Moreover, because Box was concerned that the residence may be occupied by children arriving home from school, he followed Lewis inside to prevent harm to anyone inside the home. *See* Exh. 4, at pp. 134:19-21, 136:2-7; Exh. 9, at p. 14:28-29.

25.     The house was, in fact, occupied by a resident hiding in a bedroom. *See* Exh. 2, at Edmond00000054, 58.

26.     The Crime Scene Sketch, *see* attached as Exh. 12, shows the configuration of 520 Gray Fox Run:

---

[1] Scherman mistakenly called out the wrong street address. Notwithstanding, this fact is immaterial. All officers ultimately responded to the correct address.



**Edmond Police Dept.**
**2019030824**

**520 Gray Fox Run**
Edmond, OK
04-29-2019
Officer Involved Shooting

Front Of This Wooden Shoe Rack Has What Appears To Be A Bullet Hole in the front (1' 7" south of north wall and 1' up from floor).

#1. Fired .45 Bullet Casing.
#2. Fired .45 Bullet Casing.
#3. Fired .45 Bullet Casing.
#4. Fired .45 Bullet Casing.
#5. Spent Projectile (slightly deformed).
#6. Spent Projectile (heavily deformed).
#7. Spent Bullet Jacket (deformed).
#8. Spent Projectile (heavily deformed).
#9. Sergeant Lapel Pin.
#10. Yellow Lapel Pin Backing.
#11. Yellow Lapel Pin Backing.
#12. Taser (duel – both discharged).
#13. Yellow & Pink Taser "ID Tags".
#14a. Taser Cartridge Gate.
#14b. Taser Cartridge Gate.
#15. Fired .45 Bullet Casing.

By: R. Yardley
To Scale
1" = 4'

Edmond00000617

5

27.    Immediately inside 520 Gray Fox Run's front door is a small, narrow entryway only three feet, ten inches wide. *See* Exh. 2, at Edmond00000066.

28.    A seven foot, six-inch long hallway extends from the entryway to the home's living room. *Id.*

29.    The living room is 12 feet wide and 16 feet, six inches long. *Id.*, at Edmond00000050.

30.    As Box approached the living room from the hallway, he observed Lewis attempting to exit through sliding doors at the back of the living room opposite the hallway. *See* Exh. 4, at pp. 137:10-12, 138:14-18.

31.    Box stopped at the end of the hallway and did not move further into the living room. *Id.*, at p. 138:20-21.

32.    From the entrance to the living room, Box commanded Lewis to stop and get on the ground. *Id.*, at p. 138:14-18.

33.    Instead of complying, Lewis immediately turned, clenched his fists, and charged – in an aggressive manner, like a football player making a tackle – toward Box. *Id.*, at pp. 137:18-21, 146:22-25, 147:19-21.

34.    When Lewis charged him, Box deployed his TASER. *Id.*, at p. 137:21-23.

35.    Scherman observed Lewis force his way through the glass and exited the vehicle as quickly as possible to assist Box. *See* Exh. 7, at pp. 97:11-13, 97:20-98:2.

36.    Scherman stepped through the opening left from the broken glass oval in the center of the front door but did not open the door itself. The opening was small enough that

a person would have to duck and step through one leg at a time. *Id.*, at pp. 98:16, 105:2-8, 106:19-22.

37.     At 2:09:49, Scherman radioed that he and Box were in the house. *See* Exh. 11, at 14:09:49.

38.     While making his way down the hallway, Scherman heard, but did not see, Box's first TASER deployment. Scherman described the deployment as a "good one" with a "smooth and quiet sound." *See* Exh. 7, at pp. 104:18-23, 108:6-7, 17-22.

39.     Box confirmed that the TASER connected. Notwithstanding the good connection, the TASER had no effect and did not stop Lewis's attack. *See* Exh. 4, at p. 137:22-24.

40.     Box and Lewis began fighting at the entrance to the living room, but after the fight ended and Box regained consciousness, he was located inside the living room, indicating that Box and Lewis had moved at some point during the struggle. *See* Exh. 4, at pp. 142:8-21 and 148:21-149:9.

41.     Scherman entered the living room and could see Lewis pummeling Box. Scherman described Box's face as "scared or panicked" as though he "felt like he was helpless at that moment." *See* Exh. 7, at pp. 114:14-25, 146:13-19.

42.     Meanwhile, Box deployed his TASER a second time, obtaining another effective deployment. Yet, the TASER had no effect on Lewis, who continued to attack Box. *See* Exh. 4, at p. 137:24-25; Exh. 7, at pp. 113:5-7; 113:11-114:7.

43.     Lewis continued to strike Box in the head, face, and neck, causing Box to see stars and weaken in his knees. Box felt like he was "getting ready to go unconscious." *See* Exh. 4, at p. 138:1-9.

44.     Box used his TASER a third time to drive stun[2] Lewis, which also failed to subdue him. *Id.*, at p. 138:2-5.

45.     Box was "fighting for [his] life" and feared "that [Lewis] was trying to kill [him]." *Id.*, at pp. 139:7-9, 141:16.

46.     Scherman heard Box yelling for help as Lewis continued striking him. *See* Exh. 7, at p. 116:16-20.

47.     Lewis knocked Box unconscious and he fell to the ground. *See* Exh. 4, at p. 142:1-17.

48.     After losing sight of Box when he fell to the ground unconscious, Scherman drew his firearm but did not point it at Lewis. *See* Exh. 7, at pp. 119:23-120:1, 7-10.

49.     At this time, Scherman remained at the end of the hallway as it entered the living room while Box and Lewis were in the living room itself. *See* Exh. 4, at pp. 142:18-21, 148:25-149:9; Exh. 7, at pp. 118:19-25.

50.     Scherman identified himself as a police officer, and commanded Lewis to stop and get on the ground. *Id.*, at p. 117:17-23.

---

[2] "A taser has two functions, 'dart mode' and 'drive stun mode'.... In drive stun mode, the operator removes the dart cartridge and pushes two electrode contacts located at the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system...." *Estate of Booker v. Gomez*, 745 F.3d 405, 414 n. 10 (10th Cir. 2014). Thus, a drive stun can only be achieved in very close contact situations.

51.     When Lewis turned to face Scherman, Scherman raised his firearm. *Id.*, at pp. 117:14-16, 120:11-17.

52.     Lewis charged toward Scherman like a football player, swinging his arms with closed fists. *Id.*, at pp. 120:23-121:2.

53.     Not only did Scherman fear that Box was "probably unconscious or seriously injured," he feared for his life when Lewis began charged toward him. *See* Exh. 10, at p. 11:10; Exh. 7, at p. 144:23-24.

54.     Scherman discharged his firearm. *See* Exh. 7, at p. 121:25.

55.     Scherman backed toward the entryway and front door while continuing to give Lewis commands to stop and get on the ground. *Id.*, at pp. 119:2-13; 120:20-121:2, 24-25.

56.     Undeterred, Lewis continued to barrel toward Scherman managing to punch Scherman once in the face while continuing to swing his clenched fists. *Id.*, at p. 121:5-11, 19-21.

57.     Scherman feared losing consciousness because he was "seeing stars" and feeling "unsteady" after one punch. *Id.*, at pp. 122:1-13, 144:22-25.

58.     Scherman fired his weapon four more times with all four shots hitting Lewis in the front of his body. *See* Exh. 2, at Edmond00000066.

59.     Lewis continued to attack Scherman even after being shot. *See* Exh. 7, at pp. 126:20-21, 130:17-20.

60.     Lewis did not stop attacking Scherman until the fifth shot was fired. *Id*, at pp. 126:20-21, 130:19-23.

61.    The incident finally ended at the front door when Lewis fell to the ground, and Scherman stopped firing his weapon. *Id.*, at pp. 126:22-23, 127:6-8, 129:24-130:1.

62.    At 2:10:10 p.m., Box called out "shots fired" over his radio. *See* Exh. 4, at p. 143:7-8; Exh. 11, at 14:10:10.

63.    The entire encounter between Lewis, Box, and Scherman lasted approximately 32 seconds. *See* Exh. 11, at 14:09:38 – 14:10:10.

## II.    ARGUMENTS.

Qualified immunity is a defense to an action brought pursuant to 42 U.S.C. § 1983. *Pauly v. White*, 874 F.3d 1197, 1214 (10th Cir. 2017). In response to a qualified immunity summary judgment motion, Plaintiff bears the heavy burden to establish (1) defendants violated a constitutional right, and (2) the constitutional right was clearly established. *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009). If plaintiff meets his burden, the burden shifts back to defendants to show that no genuine issues of material fact exist. *Id.*

Even viewing the facts in the light most favorable to Plaintiff, Box and Scherman are entitled to summary judgment on their qualified immunity claims.

### A.    Box and Scherman Did Not Violate Lewis' Fourth Amendment Rights Because Their Use of Force Was Reasonable.

The Fourth Amendment prohibits the use of deadly force to seize an unarmed, non-dangerous suspect. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). However, the use of deadly force is constitutional if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Id.* "To state an excessive

force claim ... [plaintiff] must show both that a seizure occurred and that the seizure was unreasonable." *Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (citation and quotation marks omitted). "Reasonableness is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Whether the officer was reasonable is an objective inquiry judged in light of the totality of the facts and circumstances confronting the officer. *Id.*

In determining reasonableness, the Court must balance three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation and internal quotation marks omitted). The Court must "account for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force necessary in a particular situation." *Pauly*, 874 F.3d at 125 (citation and quotation marks omitted).

### 1.    The severity of Lewis' crimes.

In this case, Lewis, first, physically assaulted his girlfriend prompting a 911 call. *See* Statement of Material Uncontroverted Facts ("SMUF") Nos. 1-2. Although domestic abuse,[3] is a misdemeanor, 21 O.S. § 644(C), it is a violent one, which justifies the use of

---

[3] "Any person who commits any assault and battery against a current ... intimate partner [which includes a dating relationship]" commits domestic abuse. 21 O.S. § 644(C) and 22 O.S. § 60.1(1) and (6). Dispatch called the incident a domestic disturbance. *See* SMUF No. 6.

force. *See Bond v. City of Tahlequah*, 981 F.3d 808, 819 (10th Cir. 2020) ("When the alleged crime was a misdemeanor or unaccompanied by violence, this factor weighs against an officer's use of force.").

Second, in addition to trespassing in multiple yards in his attempt to avoid arrest, Lewis violently broke into 520 Gray Fox Run. SMUF Nos. 8, 18, 21, 22. Box was concerned – as it turns out, justifiably so – that the house was occupied. SMUF Nos. 24-25. At the very least, Lewis was breaking and entering, a misdemeanor. 21 O.S. § 1438. Moreover, Box and Scherman had probable cause to believe that Lewis could be guilty of the felony of first degree burglary.[4]

Either the domestic abuse or breaking and entering are sufficient basis for officers to arrest Lewis. "Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been ... committed by the person arrested." *United States v. McKissick*, 204 F.3d 1282, 1296 n. 5 (10th Cir. 2000). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

---

[4] Oklahoma defines first degree burglary as breaking and entering "the dwelling of another, in which there is at the time some human being, with intent to commit some other crime therein." 21 O.S. §§ 1431, 1436. *See also Smith v. State*, 1959 OK CRIM APP 120, 347 P.2d 232, 234 (noting that burglary is the forcible entry with the requisite intent, the crime is complete when entry is made with the requisite intent). *See* SMUF Nos. 22-24.

Third, prior to Scherman's use of force, Lewis physically assaulted and battered Box. Assault and battery on police officer is a felony. 21 O.S. § 649(B). Assaulting a police officer is a severe crime "that inherently poses an immediate threat to the safety of officers." *Hooks v. Atoki*, 983 F.3d 1193, 1200 (10th Cir. 2020) (noting that assault on a police officer while actively resisting arrest justified use of force, but indicating that police may have used excessive force after plaintiff was already subdued). Finally, Lewis assaulted and battered Scherman. "[I]f the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape" as long as some warning is given if feasible. *Estate of Coale*, 967 F.3d at 986.

The nature of Lewis' crimes gave both Box and Scherman more than probable cause to attempt to arrest him. After assaulting and battering his girlfriend, Lewis was trespassing on multiple properties. *See* SMUF Nos. 1, 8, 9. Additionally, Box had good reason to follow Lewis into the house. He reasonably believed that Lewis did not live in the home, and that someone could be home (which was, in fact, true). *See* SMUF No. 21-25. Given the facts, this factor weighs in favor of the officers' use of force.

### 2. Lewis was actively resisting arrest and attempting to evade arrest by flight.

The facts are uncontradicted. From the first moment Lewis saw four police attempting to apprehend him, he evaded and resisted them. *See* SMUF Nos. 7, 8, 17-18, 32-33, 50-52. Although Box tased Lewis three times, Lewis continued to resist. *See* SMUF

Nos. 34, 38-39, 42-44. Lewis continued to evade and resist officers throughout the entire encounter, including that with Box and Scherman.

This factor also weighs in favor of the use of force.

### 3. Lewis posed an immediate threat to the safety of the officers.

This factor is the "most important" and fact intensive. *Pauly*, 874 F.3d at 125. "Deadly force is justified only if a reasonable officer" in the same position "would have probable cause to believe that there was a threat of serious physical harm to himself or others." *Id.* (citation and quotation marks omitted). "Reasonableness is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation and quotation marks omitted). At issue is whether the officer was in danger at the very moment he/she used force. *Id.*

In determining the degree of threat, the court considers several nonexclusive factors including: (1) "the suspect's compliance with police commands"; (2) whether the suspect made hostile motions toward the police; (3) the distance between the officers and the suspect when force was employed; and (4) "the manifest intentions of the suspect." *Id.* (citation and quotation marks omitted). "[A] reasonable but mistaken belief that the suspect is likely to fight back justifies using more force than actually needed." *Thomson*, 584 F.3d at 1315; *Estate of Larson v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

#### a. Lewis refused to comply with officer commands.

The record is unequivocal: for over an hour after the first 911 call, Lewis ignored police commands and actively evaded police. *See* SMUF Nos. 7, 8, 17-18, 32-33, 50-52.

Hoping to deescalate the situation, Box and Scherman arrived in an unmarked vehicle with no lights or sirens, and spotted Lewis in a yard. *See* SMUF No. 10-11. For the first time, Box ordered Lewis to stop and get on the ground, a request Lewis ignored. *See* SMUF Nos. 17-18. After following Lewis into the living room at 520 Gray Fox Run, Lewis continued to ignore Box's commands to stop and get on the ground. *See* SMUF Nos. 32-33.

Not only did Lewis refuse to comply, he did the exact opposite, charging at, and physically attacking Box despite Box's repeated use of his TASER. *See* SMUF Nos. 33, 39-44. Box, a 19-year veteran of the Edmond Police Department was well-versed in TASER use having been an instructor for twelve to fourteen years. *See* SMUF No. 13. Scherman and Box confirmed that the TASER connected three times. *See* SMUF Nos. 38-39, 42, 44. Lewis was unfazed. Scherman could see that Box was frightened, and Box confirmed that he was fighting for his life. *See* SMUF Nos. 41, 45. Box was calling for help as Lewis continued to hit him. *See* SMUF No. 46. Lewis managed to physically overcome a six foot tall, 208 pound Box. *See* SMUF Nos. 12, 47.

Correspondingly, after seeing Box drop to the ground after three attempts to subdue Lewis by TASER proved ineffective, Scherman, much smaller than Lewis, identified himself as a police officer and commanded Lewis to stop and get on the ground. *See* SMUF Nos. 14, 50. Again, rather than comply, Lewis charged at, and physically attacked Scherman. *See* SMUF No. 52. As Scherman backed away from Lewis down the confined space of the hallway, he continued to order Lewis to stop and get on the ground. *See* SMUF No. 55. Lewis continued to advance, even after being shot, hitting Scherman in the face hard enough to make Scherman see stars. *See* SMUF Nos. 5-57. At no time during the

entire encounter did Lewis even momentarily comply with a single command issued by either officer.

b.      **Lewis' actions toward the officers were patently hostile.**

This is simply not a case where a jury could conclude that either Box or Scherman were never in danger of serious bodily injury at the hands of Lewis. Unlike cases where the suspects waived weapons at police from a distance, in this case, Lewis physically attacked both officers.

Lewis was a large man – six feet tall and 205 pounds – who was uncontrollably combative from the start of the encounter. *See* SMUF Nos. 3, 15, 33-34, 40-41, 43, 45. Three clean TASER deployments failed to slow him down, let alone disable him. The physical assault on Box, himself six feet tall and 208 pounds, knocked him unconscious. *See* SMUF No. 47. Scherman, at five feet nine or ten inches tall and 170 pounds was considerably smaller than both Box and Lewis. *See* SMUF No. 14. Not only did Scherman see that Lewis was completely unfazed by Box's TASER deployments, he saw Lewis beat Box to the ground, and he feared Box was gravely injured or even dead. *See* SMUF No. 53.

When Lewis turned on Scherman and began quickly advancing, Scherman had "probable cause to believe that there was a threat of serious physical harm" to him. *Estate of Harmon v. Salt Lake City*, 471 F. Supp. 3d 1203, 1219 (D. Utah 2020) (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)). "[C]losed-fisted blows may constitute deadly force." *Davenport v. Causey*, 521 F.3d 544, 553 (6th Cir. 2008) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) (brackets and ellipses omitted)). "An officer's use of deadly force in self-defense is not constitutionally unreasonable." *Id.* (quoting *Garner*, 471 U.S. at 7). Thus, "[a] reasonable perception of imminent danger, even

if mistaken, may be consistent with the reasonable use of deadly force." *Estate of Harmon*, 471 F. Supp. 3d at 1219 (quoting *Estate of Ronquillo by and through Estate of Sanchez v. City & Cty. of Denver*, 720 Fed. Appx. 434, 439 (10th Cir. 2017) (unpublished)).

Moreover, when Scherman began firing shots, the danger from Lewis was immediate. *Estate of Coale* is instructive. A deputy shot and killed a suspect who was attempting to flee in a vehicle. Because they were alone on a rural dirt road, the only individual in potential danger was the deputy. Although the deputy was forced to move out of the way of the vehicle as it approached, he fired after the vehicle was already past him hitting the suspect in the back of the head. 967 F.3d at 987. The deputy did not use force to avoid being hit since he had room to step aside *Id.* at 991. At the precise moment he used deadly force, the danger was already past. *Id.* Consequently, the deputy was not entitled to summary judgment on his claim for qualified immunity. *Id.*

By contrast, at the moment Scherman fired his first shot, Lewis had turned on Scherman (who had just witnessed Lewis overcome Box) and quickly started toward him. *See* SMUF Nos. 51-52. The first shot did not dissuade Lewis from continuing to rapidly advance on Scherman. *See* SMUF Nos. 54, 56. Incredibly, Lewis was able to physically assault Scherman leaving him dazed and bruised even as Scherman backed down the narrow hallway and shot several more times. *See* SMUF Nos. 57-58. That Scherman continued to back away, and Lewis continued to advance is conclusively clear because all of Scherman's shots entered the front of Lewis' body, and the incident concluded near the front door. *See* SMUF Nos. 58-61. The entire encounter between Box, Scherman and Lewis took a mere 32 seconds. *See* SMUF Nos. 62-63.

18

This factor weighs in favor of the officers' use of force.

> ### c.   Lewis was close to both officers when they employed force.

There was very little distance between Box and Lewis when he deployed his first TASER shot. At most, when Box entered the living room, Lewis was less than sixteen feet from him. *See* SMUF Nos. 26, 29, 31. Lewis began quickly advancing on Box closing the distance even more. *See* SMUF No. 33. Lewis continued to quickly advance on Sgt. Box despite taking a clean TASER hit. *See* SMUF No. 34, 38-39. Consequently, Box tased Lewis a second time. Again, despite an effective TASER deployment, Lewis continued to advance on Sgt. Box. In seconds, Lewis had managed to close the distance such that Box and Lewis were essentially engaged in a hand-to-hand struggle at the entrance to the living room. *See* SMUF Nos. 32-34. During the struggle, Lewis and Box moved back into the living room. *See* SMUF No. 40.

Scherman saw Box go down after three TASER deployments had no visible effect on Lewis. Scherman and Lewis could not have been more than twelve feet (the width of the living room) when they encountered one another. *See* SMUF No. 26, 28-29, 41, 49. Importantly, the facts are uncontradicted that Lewis disregarded Scherman's commands to stop and get on the ground, and began to rapidly advance on Scherman. *See* SMUF No. Nos. 51-52. The facts are also uncontradicted that, within seconds, Lewis had closed the distance between the two since he was able to hit Scherman with his fists. *See* SMUF Nos. 55-56. Given these circumstances, Scherman reasonably believed that Lewis was close enough to pose an immediate threat. Assuming Lewis struck Scherman before a shot hit Lewis, Lewis was clearly within close contact with Scherman. On the other hand, even if

Lewis struck Scherman after a shot hit his body, Lewis continued to pose a threat justifying the continued use of force.

The facts demonstrate that Lewis' distance to the officers supports their use of force.

**d.    Lewis clearly manifested the intention to harm the officers.**

Despite that fact that both Box and Scherman announced their presence and commanded compliance, Lewis' actions demonstrate that he was intent on avoiding arrest at any cost. He was combative and purposefully advanced on both officers before actually assaulting them.

Because each of the *Graham* and *Larson* factors supports the officers' use of force, they are entitled to summary judgment.

**B.    Lewis' Rights Were Not Clearly Established.**

"[I]mmunity protects all but the plainly incompetent or those who knowingly violate the law." *Estate of Coale*, 967 F.3d at 995, Briscoe, J. dissenting at 995 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). Therefore, to overcome summary judgment, plaintiff must establish that the constitutional right violated was clearly established. This inquiry is a purely legal determination. *Id.* at 992.

In determining whether the law is clearly established, "'particularly [] in excessive force cases,'" the court may "'not define clearly established law at a high level of generality.'" *Bond*, 981 F.3d at 825 (internal ellipses omitted) (quoting *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019)). Prior cases need not be exactly factually on point to provide "'fair warning' to the defendants 'that their alleged conduct was unconstitutional.'" *Id.* (brackets omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656

20

(2014)). Yet, "unlawfulness must be apparent" "in light of pre-existing law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[W]hile this rule 'does not require a case directly on point,' it does require that 'existing precedent must have placed the ... constitutional question beyond debate." *Pauly*, 874 F.3d at 1210 (internal brackets omitted) (quoting *White v. Pauly (Pauly II)*, 137 S. Ct. 548, 551 (2017)). The Court must look to decisions of the Tenth Circuit, the Supreme Court, or the clearly established weight of authority from other courts to ascertain whether the constitutional right at issue was clearly established. *Id*.

A search for relevant cases reveals no cases sufficiently factually similar to this one in the Supreme Court or Tenth Circuit, and certainly none that hold that an officer in either Box's or Scherman's position should have known he was violating Lewis' Fourth Amendment rights. It is not appropriate simply to ask whether a reasonable officer would have known it was unconstitutional to shoot an unarmed person. Rather, there must exist a case similar enough to give Scherman fair notice that it was inappropriate to use deadly force when a known unarmed suspect was nonetheless advancing quickly on him after having withstood three direct TASER hits, and, nonetheless knocked a fellow officer unconscious.

In fact, factually similar cases from other jurisdictions establish that Lewis' claimed right was **NOT** clearly established. For instance, in *Mitchell v. Schlabach*, 864 F.3d 416 (6th Cir. 2017), the court concluded that the officer's conduct was not contrary to clearly established law. There, Mitchell was reported as drunk and having assaulted an individual. After Officer Schlabach identified Mitchell's car, Mitchell led Schlabach on a ten minute

21

high speed vehicle chase through residential neighborhoods. Eventually, Mitchell's vehicle came to rest in a ditch. Mitchell, who appeared to the officer to be unarmed, exited his vehicle. Schlabach approached the vehicle with his gun drawn commanding Mitchell to stop and get on the ground. Mitchell instead started aggressively moving toward Schlabach. Schlabach backed away from Mitchell, but Mitchell continued to approach. When Mitchel was ten to twenty feet away, Schlabach shot Mitchell who nonetheless continued to advance on Schlabach. Schlabach stepped back and again shot Mitchell. Only then did Mitchell stop retreating.

The court could locate no factually similar case holding that an officer would not reasonably believe his life to be in danger such that using deadly force was constitutional when the suspect was actively ignoring "commands to 'get on the ground' as he continued charging toward" the officer. *Id*. at 425. That is, plaintiff identified no cases in which the suspect posed an immediate threat to the officer's safety and, yet, it was objectively unreasonable for the officer to fear for his safety. *Id*.

In *Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997) the appellate court reversed the trial court's denial of summary judgment to the officer on qualified immunity. In that case, a highway patrolman pulled over a driver, determined the driver had an outstanding traffic warrant and placed him under arrest. The trooper, five feet six inches tall and weighing 160 pounds, wanted to release the vehicle to the six foot one inch 225 pound passenger. Meanwhile, a county deputy arrived and observed from a distance. The passenger complied with orders to step out of the vehicle, but refused to give his name or answer questions honestly. After initially complying with demands to place his hands on his head and get on

22

his knees, the passenger refused further orders and started to rise. The deputy approached and began to help the trooper subdue the passenger. The trooper used his baton on the passenger as the deputy tried to hold him. The passenger first punched the deputy who fell to the ground, and then the trooper. The passenger hit the deputy again this time leaving him unconscious. The trooper fired shots at the passenger from a prone position as passenger had taken two steps away from the trooper toward the patrol car where a shot gun was located.

In concluding that the trooper's conduct was objectively reasonable under the circumstances, the court observed that the passenger had disobeyed both the trooper's and deputy's commands, had "violently and forcefully resisted the officers' attempts to control him" knocking them both to the ground. *Id.* at 99-100. Moreover, the trooper's "attempts to control [passenger] with non-deadly force ... had failed. At the time [trooper] drew his weapon and fired the first shot, [passenger] was standing between [the trooper and the deputy] in a position to inflict serious harm with or without a weapon." *Id.*

Finally, in *Davenport*, 521 F.3d 544, the appellate court likewise reversed the district court's denial of the officer's motion for summary judgment on qualified immunity. There, the suspect became belligerent during a routine traffic stop. The suspect exited his vehicle and refused commands to return to his vehicle. Because the officer considered suspect's noncompliance aggressive, he called for backup. The officer reached for the suspect to begin an arrest. The suspect brushed the officer's hand away. The officer drew his TASER and deployed it to no effect. The suspect began wrapping the TASER wires

23

around his hand attempting to pull it from the officer's hand. At that point, the backup arrived.

The officer tried to drive-stun the suspect. When the officer closed the distance between he and the suspect, the suspect began assaulting the officer causing him to fall to the ground. The suspect then turned his attention to the backup who had joined the fray to attempt to subdue the suspect. The suspect then began assaulting the backup. The officer shot the suspect before he could deliver a third blow to the backup fearing that the suspect would kill the backup.

The court determined that the conditions with which the officer was faced counseled the use of force. *Id.* at 552. Although the suspect outweighed officer, the officer, who was ten years younger and had SWAT training, was not himself a small man. *Id.* at 553. Nonetheless, the suspect was able to overcome him. The suspect beat both officers hitting them in the head where it is more likely to cause severe injury. *Id.* Davenport had been stopped for speeding yet was reacting in an extremely violent and angry manner excessive to the situation. *Id.* One minute and eight seconds elapsed from the time Davenport exited his vehicle to the time he began assaulting the officers. Because "things evolved rapidly" the officer's "on-the-spot decisionmaking" was entitled to deference. *Id.* The suspect never broke off his attack and there was no indication that he would. Thus, the court could not "say that a reasonable officer on the scene facing such a suspect and having to decide very quickly could not have reasonably believed" that "serious physical injury or death was [] imminent." *Id.*

24

*Schlabach*, *Colston* and *Davenport* each present a scenario where an unarmed suspect physically attacked police officers despite commands to stop. In both *Colston* and *Davenport*, as in this case, the respective suspects knocked officers unconscious after attempts to use non-deadly force failed. In all three cases, as in this case, events unfolded rapidly. In *Colston*, like this case, the officer wielding deadly force was smaller than the attacking suspect. However, the incidents in *Schlabach*, *Colston* and *Davenport* did not occur in the tight confines facing Box and, particularly, Scherman.

Similar cases counsel that an officer is fully justified in using deadly force in the same circumstances confronting Box and Scherman. "Because there is no case close enough on point to make the alleged unlawfulness of [Box's and Scherman's] actions apparent," they are entitled to qualified immunity. *Pauly*, 874 F.3d at 1223.

WHEREFORE, premises considered, because the facts are uncontroverted that Defendants had a reasonable believe that Isaiah Lewis posed a threat of serious physical harm to them, and because they did not violate Isaiah Lewis' clearly established constitutional rights, Defendants Milo Box, and Denton Scherman are entitled to qualified immunity.

Respectfully submitted,


*s/ Kathryn D. Terry*
Kathryn D. Terry, OBA # 17151
Cody J. Cooper, OBA # 31025
Phillips Murrah P.C.
101 North Robinson
Corporate Tower, 13th Floor
Oklahoma City, OK 73102
(405) 235-4100 Telephone
(405) 235-4133 Facsimile
kdterry@phillipsmurrah.com
cjcooper@phillipsmurrah.com

*Attorneys for Defendants Milo Box and Denton Scherman*

## CERTIFICATE OF SERVICE

On the 3rd day of May, 2021, a copy of the foregoing Motion for Summary Judgment and Brief in Support was served via the Court Clerk's ECF filing system and mailed via regular U.S. Mail, postage prepaid, to the following:

David J. Batton
Law Office of David J. Batton
P.O. Box 1285
(303 W. Gray, Suite 304)
Norman, OK 73070
Tel: (405) 310-3432
Fax: (405) 310-2646

Andrew M. Stroth
Carlton Odom
Amanda Yarusso
Action Injury Law Group, LLC
191 North Wacker Drive
Suite 2300
Chicago, IL 60606
Tel: (312) 771-2444
Fax: (312) 641-6866

Woodrow K. Glass
Geoffrey A. Tabor
Ward & Glass, LLP
1601 36th Ave. NW
Norman, OK 73072
Tel: (405) 310-3432
Fax: (405) 310-2646
*Attorneys for Plaintiffs*


*and*

Richard Hornbeek,
B. Taylor Clark,
Hornbeek Vitali & Braun, PLLC
3711 North Classen Boulevard
Oklahoma City, OK 73118
(405) 236-8600 Telephone
(405) 236-8602 Facsimile
*Attorneys for City of Edmond*


*s/ Kathryn D. Terry*
Kathryn D. Terry