**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) VICKI JO LEWIS, individually and as co-Personal Representative of the ESTATE OF ISAIAH MARK LEWIS, deceased; and (2) TROY LEVET LEWIS, individually and as co-Representative of the ESTATE OF ISAIAH MARK LEWIS, deceased,<br><br>                    Plaintiffs,<br><br>vs.<br><br>(1) CITY OF EDMOND, OKLAHOMA;<br>(2) POLICE SGT. MILO BOX; AND<br>(3) POLICE OFFICER DENTON SCHERMAN,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)        Case No. CIV-19-489-R |

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT CITY OF EDMOND, OKLAHOMA'S MOTION FOR SUMMARY JUDGMENT**

---

i

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………...……………………………..ii

TABLE OF AUTHORITIES ………………………………………………………iii-iv

INTRODUCTION ………………………………………………………………...2

RESPONSE TO THE CITY'S STATEMENT OF FACTS……………………………2-3

PLAINTIFFS' STATEMENT OF ADITIONAL MATERIAL FACTS…………..……3-5

ARGUMENTS AND AUTHORITIES ………………………….…………………5-19

    I.     The Standard for Summary Judgment ......……………….…………......5-6

    II.    There are Material Fact Disputes that Must Preclude
          Summary Judgment…………………………………...………………6-7

    III.   The Applicable Standards for Municipal Liability Claims………………7-8

    IV.   The City Failed to Train its Officers…………………….……………8-15

    V.    The City Violated Isaiah's Rights Under the Equal Protection
         Clause……………………………………………………………16-18

    VI.   The City was Negligent Through the Acts of Box and
         Scherman…………………………...……………………………18-19

CONCLUSION……………………………………………………………………..19

# TABLE OF AUTHORITIES

## Cases

Allen v. City of Muskogee, Okl.,
119 F.3d 837 (10th Cir. 1997)………………………..………………………9, 12-14

Barney v. Pulsipher,
143 F.3d 1299, 1307 fn. 5 (10th Cir. 1998)……………………………………………9

Brown v. Gray,
227 F.3d 1278 (10th Cir. 2000)……………………...…………………………10-11

Brown v. Montoya,
662 F.3d 1152, 1172-73 (10th Cir. 2011)…………………………………………..16

Bryson v. City of Okla. City,
627 F.3d 784, 788 (10th Cir. 2010)……………………………………………………8

Carr v. Castle,
337 F.3d 1221, 1229 (10th Cir. 2003)…………………………...…………………..9

City of Canton v. Harris,
489 U.S. 378 (1989)……………………………….…………………………7-9

City of Cleburne v. Cleburne Living Ctr.,
473 U.S. 432, 439 (1985)…………………………………………………………16

Fisher v. Univ. of Texas at Austin,
570 U.S. 297, 308 (2013)…………………………………….……………………..16

Fox v. Mize,
2018 OK 75, ¶8, 428 P.3d 314, 319………………………………..………………………18

Henderson v. Inter-Chem Coal Co., Inc.,
41 F.3d 567, 569 (10th Cir. 1994)…………………………..………………………..6

Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,
507 U.S. 163, 166 (1993)………………………………………………………………8

Monell v. Dep't of Social Servs.,
436 U.S. 658, 690-91 (1978)……………………………...…………………………7

Myers v. Oklahoma County Board of County Commissioners,
151 F.3d 1313 (10th Cir. 1998)………………………………..……………...10-11

Olsen v. Layton Hills Mall,
312 F.3d 1304 (10th Cir. 2002)…………………..…………………………….10, 12

Price-Cornelison v. Brooks,
524 F.3d 1103, 1109 (10th Cir. 2008)………………………………….…………..16

Romer v. Evans,
517 U.S. 620, 631 (1996)………………………………..…………………………16

Zuchel v. City and County of Denver,
997 F.2d 730, 734-35 (10th Cir. 1993)……………...………………………………8

**Statutes and Rules**

Fed. R. Civ. P. 56(c)…………………………………………………………………5

OUJI-CIV 9.1 (3d ed)………………………………………………………………18

OUJI-CIV 9.2 (3d ed)……………………………..…………………………………18

**Other**

Dulaney, Josh. *Some see race at play in Edmond police tactics*,
The Oklahoman. June 25, 2019.
(available at https://www.oklahoman.com/article/5634694/some-see-race-at-play-in-the-
difference-with-edmond-police-tactics)..........................................................................17

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) VICKI JO LEWIS, individually and as co-Personal Representative of the ESTATE OF ISAIAH MARK LEWIS, deceased; and (2) TROY LEVET LEWIS, individually and as co-Representative of the ESTATE OF ISAIAH MARK LEWIS, deceased, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. CIV-19-489-R |
| (1) CITY OF EDMOND, OKLAHOMA; (2) POLICE SGT. MILO BOX; AND (3) POLICE OFFICER DENTON SCHERMAN, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT CITY OF EDMOND, OKLAHOMA'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Vicki Jo Lewis and Troy Levet Lewis, individually and as Co-Personal Representatives of the Estate of Isaiah Mark Lewis ("Isaiah"), deceased, submit the following Response in Opposition to the Motion for Summary Judgment filed by Defendant City of Edmond, Oklahoma ("City" or "Defendant" for purposes of this Response only) [Doc. 64]. For the reasons stated herein, City's Motion must be denied. Plaintiffs show this Court the following:

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## INTRODUCTION

The City argues that the training provided to Defendants Box and Scherman met state standards. However, Box and Scherman testified that they did not consider Isaiah Lewis to be an individual suffering from a mental health crisis and did not use their mental health training in confronting Isaiah and using force on him. Other responding officers testified that the City's mental health policy and training does not require a coordinated response to individuals in apparent substance-induced or mental health crises and described inconsistent understandings of how officers should handle such situations. The City's officers are not required to carry less lethal tools of force and are not properly trained in the importance of having and using intermediate force tools. This is evidence of the City's failure to properly administer their policies and training and failure to supervise officers' implementation and adherence to those standards. These failures, in turn, led to Box and Scherman's excessively aggressive confrontation and unjustified use of force against Isaiah in violation of the Constitution and state negligence law which are discussed herein.

## RESPONSE TO THE CITY'S STATEMENT OF FACTS

**DSF[1] 1-7:** Admitted.

**DSF 8:** Denied. This fact is disputed to the extent that Box lacks the foundation and expertise to testify as to a "good" taser deployment, based on the sound. Further disputed that Box was struck in the face. Photos of Scherman following the shooting and a few days

---

[1] DSF refers to Defendant City's Statement of Facts.

later do not show any markings or injuries and medical examiners did not observe any injuries. PX 10, Scherman Photos; PX 5, Scherman Dep. at 148:15-146:4.

**DSF 9-12:** Not disputed.

**DSF 13:** Denied. This fact is disputed that Defendants Box and Scherman or other responding officers to the call involving Isaiah Lewis knew that Isaiah was in a state of cannabinoid induced psychosis, as they did not know what, if any, substances Isaiah had consumed or what mental condition was affecting Isaiah. Not disputed that responding officers recognized that Isaiah was behaving abnormally and appeared to be in a substance-induced or mental health crisis. PX 3, King Dep. at p. 18:1-19:10, 21:14-21:21, 22:10-24:11, 39:6-39:22, 66:14-67:8; PX 2, Radcliff Dep. at p. 18:9-19:18, 20:8-20:19, 21:11-21:15, 32:6-32:25, 33:13-34:22.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

1.      Officers should approach a person in altered mental stated, cautiously and in a calm manner, and avoid a confrontation which could escalate the situation. PX 3, King Dep. at p. 69:2-69:20; Gilbertson Report at p. 10-11 (section C).

2.      Box and Scherman did not appreciate that Isaiah was experiencing a mental health crisis and did not use their mental health training in responding to the call, despite monitoring the call notes and being aware that Isaiah had stripped off his clothes, was possibly under the influence of an illicit substance, and had "flipped out" according to Lewis's girlfriend. PX4, Box Dep. at p. 74:11-76:20, 82:22-83:25, 85:10-85:20, 90:2-93:11, 94:20-96:7, 193:22-195:10. PX 5, Scherman Dep. at p. 51:20-52:7, 53:1-53:5, 143:17-144:8, 15414-154:18; PX 11, Gilbertson Report at p. 5 (¶ 22-23).

3.     Box was aware of de-escalation and crisis intervention techniques when dealing with someone who may be in an altered mental state due to substance use or mental health issues, such as talking to the subject to get them to calm down, but did not use them with Isaiah Lewis, in contravention of accepted police practices and training. The City did not consistently train or assess officers' understanding of officers' mental health training. For example, King (the officer originally assigned to the call) understood, as part of his Crisis Intervention Team ("CIT") training, how to interact and communicate with people in an apparent mental health crisis with the goal of ending an encounter in a more peaceful or less harmful manner, but Box intervened and escalated the situation with Lewis. PX 4, Box Dep. at p. 94:20-95:22, 100:7-100:16, 109:7-109:20; PX 1, King Dep. at p. 31:3-33:19, 35:6-35:14; PX 11, Gilbertson Report at p. 5 (¶ 22-23), 10-11 (section C).

4.     When Box and Scherman spotted Lewis, Box jumped from the vehicle before it came to a complete stop, shouted commands at Lewis and pointed his taser at Lewis, without waiting for Scherman to park and accompany him, and without waiting for the two other officers he had encountered approximately a block behind them. PX 4, Box Dep. at p.  78:21-79:6,  79:22-80:7,  82:22-83:25,  109:7-109:20,  128:3-128:9,  130:2-130:25, 175:24-176:21; PX 5, Scherman Dep. at p. 92:13-93:1, 94:14-95:17, 97:2-97:7, 98:24-99:20.

5.     There was no coordinated approach to use de-escalation or other techniques with Isaiah Lewis among the multiple responding officers during the hour period searching for and pursuing Isaiah Lewis, and no efforts made to contact family or loved ones of Isaiah. This lack of coordination has occurred on other occasions involving individuals

experiencing a mental health crisis. PX 1, King Dep. at p. 40:8-40:22, 64:11-65:11; PX 4, Box Dep. at p. 116:13-23; PX 2, Radcliff Dep. at p. 31:3-31:9, 33:2-33:12, 35:22-36:13.

6.     The City's officers have inconsistent understandings of how to respond to subjects in apparent or possible mental health or substance-induced crisis, including the role of CIT officers and how they should use their special training. Despite providing additional training through the CIT program, Edmond had no requirement to involve a CIT officer to respond to calls of individuals that may be suffering from a mental health crisis, and there are no special protocols that CIT officers follow in responding to a call involving a mental health concern. PX 1, King Dep.at p. 26:2-26:8, 27:8-27:24, 28:2-28:25; PX 6, Hussey Dep. at p. 61:23-62:19, 63:20-64:10, 64:24-65:3, 65:11-65:19, 66:6-66:22, 68:14-69:22, 70:12-70:20, 74:4-74:18.

7.     The City's policy did not require officers to carry more than one less lethal tool on belt, in contradiction of objectively and widely-accepted reasonable police practices; therefore, Scherman had no less lethal tools on his belt, except for a taser, because he deliberately chose not to carry them, PX 1, King Dep. at p. 48:5-45:19, 47:2-47:17; PX 5, Scherman Dep. at p. 60:4-60:8, 60:21-61:3, 61:8-61:13; PX 11, Gilbertson Report at ¶ 22-23, p. 10-11, section C, p. 17-18: ¶ 61, p. 21.

## ARGUMENTS & AUTHORITIES

### I.     The Standard for Summary Judgment

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, courts view all facts and any reasonable inferences

that might be drawn from them in the light most favorable to the nonmoving party and determine whether there exists a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Henderson v. Inter-Chem Coal Co., Inc., 41 F.3d 567, 569 (10th Cir. 1994), *as modified on denial of reh'g* (Dec. 5, 1994). An issue of material fact is genuine if a "reasonable jury could return a verdict for the nonmoving party." Id.

## II.   There are Material Facts Disputes that Must Preclude Summary Judgment.

There are foundational fact disputes regarding the City's actual implementation and use of the policies and training at issue. Furthermore, because there exist material fact disputes as to Box and Scherman's underlying conduct at issue, summary judgment in the City's favor is further improper.

The City points to the documented hours of training that Box and Scherman completed, but it is not enough to point to certificates and powerpoint presentations. Box, Scherman, and other responding officers' testimony evidences the City's failure to implement this training in any meaningful way. For instance, numerous officers are certified CIT officers, having completed the training; yet, there is no requirement to have a CIT officer respond to a call of a person in crisis and no specific or distinct protocols for CIT officers to utilize in responding. Box's intervention in the call and his aggressively confrontational approach that escalated a non-violent, non-exigent situation to a physical and deadly encounter in 35 seconds, was the result of the City's failure to train and supervise officers. Scherman's use of deadly force arose from Box's excessive approach and use of force. Scherman resorted immediately to deadly force because of the lack of

adequate less lethal force tools and training to respond to Isaiah, who was unarmed and flailing his arms at Scherman. The parties' respective experts clearly disagree on the reasonableness of the underlying constitutional violation allegations, and they further disagree on the policy-level training issues imputable to the City. Given these disputes, the resolution of these factual matters must be left for the trier of fact. Thus, for these reasons, this Court should deny the City's Motion for Summary Judgment.

### III.   The Applicable Standards for Municipal Liability Claims

Municipalities are liable for the constitutional violations committed by their employees when the violation is caused by a municipal custom, policy, or practice. Monell v. Dep't of Social Servs., 436 U.S. 658, 690-91 (1978). When a municipality's failure to train its employees reflects deliberate indifference to the plaintiff's constitutionally protected rights, that failure to train may "be properly thought of as a [municipal] policy" that is actionable under 42 U.S.C. § 1983. City of Canton v. Harris, 489 U.S. 378, 389 (1989).

The Tenth Circuit has described several types of actions which may constitute a municipal policy or custom:

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5)

the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted). The City is liable in the case at bar for failing to adequately train its officers.

## IV.   The City Failed to Train its Officers.

The record establishes that the City failed to properly train its officers for matters involving (1) crisis intervention and (2) use of force. Plaintiffs will address the applicable standards for this claim and then address each element in turn.

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. 378, 388 (1989). There are four essential elements to this type of claim. The plaintiff must present evidence sufficient to show the following: (1) the City's officers violated Isaiah's constitutional rights, (2) the violations arose under circumstances that were usual and recurring situations for the City's officers, (3) the City's inadequate training of its officers demonstrates deliberate indifference, and (4) there is a direct causal link between the constitutional deprivations and the inadequate training or supervision. *See* Zuchel v. City and County of Denver, 997 F.2d 730, 734-35 (10th Cir. 1993). Unlike individual employees, municipalities themselves do not have absolute or qualified immunity from suit under § 1983. *See, e.g.,* Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166 (1993).

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result

in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." Carr v. Castle, 337 F.3d 1221, 1229 (10th Cir. 2003) (*quoting* Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)). Generally, notice may be established "by proving the existence of a pattern of tortious conduct." Id. However, "a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate." Allen v. City of Muskogee, Okl., 119 F.3d 837, 842 (10th Cir. 1997). "Rather, evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." Id.

In Allen, the Tenth Circuit (*quoting* City of Canton v. Harris, 489 U.S. 378 (1989)) explained when inadequate police training constitutes city policy:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

Id. at 842.

The deliberate indifference standard in failure to train cases is different than the same standard as applied in Eighth Amendment cases. Barney v. Pulsipher, 143 F.3d 1299, 1307 fn. 5 (10th Cir. 1998). In this context, the "deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." Id.

A.  Constitutional Violation

First, Plaintiffs have established the underlying constitutional violations against Defendants Box and Scherman, the City's employees and officers at issue. On this point, Plaintiffs would direct the Court to their Response to Defendant Box and Scherman's Motion for Summary Judgment. Accordingly, the first element of municipal liability has been met.

B.  Usual and Recurring Circumstances

Second, the violations at issue arose under circumstances that were usual and recurring situations for the City's officers. Police officers often come into contact with those who are mentally ill, under the influence of alcohol and/or drugs, are undergoing significant mental or emotional trauma, and those who are experiencing significant mental health episodes.

The Tenth Circuit has repeatedly held that the failure to provide any or scant training regarding the appropriate interactions with mentally ill citizens can establish deliberate indifference even in the absence of a pattern of similar constitutional violations. Olsen v. Layton Hills Mall, 312 F.3d 1304 (10th Cir. 2002); Brown v. Gray, 227 F.3d 1278 (10th Cir. 2000); and Myers v. Oklahoma County Board of County Commissioners, 151 F.3d 1313 (10th Cir. 1998).

In Myers, the Tenth Circuit addressed issues regarding officers' use of deadly force against a person with a mental illness. In considering the plaintiffs' failure-to-train claim, the Court noted that "[t]he plaintiffs' stronger argument is that the moving force behind the alleged constitutional violation was not the County's policy on force, but the minimal

amount of training on dealing with armed persons who are suicidal, mentally ill, and/or substance abusers." <u>Id</u>. at 1319. The Court implicitly recognized that such a claim is viable even in the absence of a pattern of constitutional violations, even though the Court ultimately affirmed summary judgment on the claim due to a lack of evidence in the record about the inadequacy of the county defendant's training program. <u>Id.</u>

The Tenth Circuit also addressed this element in the context of the mentally ill in <u>Brown</u>, 227 F.3d 1278 (10th Cir. 2000). In <u>Brown</u>, the Tenth Circuit affirmed the trial court's denial of the City of Denver's motion for judgment as a matter of law following a jury verdict against it for failure to train. <u>Brown</u>, 227 F.3d at 1291. There, an unarmed mentally ill person was shot and killed by an off-duty police officer. The City's training officers testified that there was a conscious decision made in the training program to treat officers as always armed/always on duty. The Court wrote that encounters with mentally ill persons while off duty was a usual and recurring circumstance that officers were likely to confront, and that the conscious choice to make this training decision presented a plainly obvious risk of constitutional violations. "Captain O'Neill [the training officer] knew to a moral certainty that the policy would result in some officers taking police action while off-shift, yet he pursued a training program that did not adequately prepare the officers to do so." <u>Id.</u> at 1290. The same scenario is present here, as the City knew to a moral certainty that officers would come into contact with mentally ill persons but it failed to adequately prepare its officers for these encounters. The Court held that the plaintiff did not have "to prove the existence of a pervasive problem" in order to show deliberate indifference. <u>Id.</u> at 1289.

In <u>Olsen</u>, 312 F.3d 1304 (10th Cir. 2002), the Tenth Circuit addressed a claim that a county defendant had failed to adequately train its prebooking jail officers in addressing those with the mental illness of Obsessive Compulsive Disorder (OCD). The Court first noted that OCD appears in about 2% of the population, and then went on to recognize that the county defendant did not have appropriate training on booking individuals into the jail with this disease. The Court noted the following:

> Given the frequency of the disorder [Obsessive Compulsive Disorder], Davis County's scant procedures on dealing with mental illness and the prebooking officers' apparent ignorance to [the plaintiff's] requests for medication, a violation of federal rights is quite possibly a plainly obvious consequence of Davis County's failure to train its prebooking officers to address the symptoms. And this is for a jury to decide.

<u>Id</u>. at 1320 (internal quotation marks and citations omitted).

### C.  <u>Deliberate Indifference – Crisis Intervention</u>

Third, Plaintiffs have established that the City's inadequate training of its officers and its policies, practices, and customs regarding crisis intervention demonstrates deliberate indifference.

In <u>Allen</u>, 119 F.3d 837 (10th Cir. 1997), the Tenth Circuit held that the City of Muskogee's failure to train its officers on how to deal with mentally ill or emotionally upset persons who are armed with firearms could be considered a municipal policy. The Court primarily relied on the expert testimony of Dr. George Kirkham, who testified "that the officers' actions were reckless and totally contrary to proper police practices for dealing with armed mentally ill or emotionally upset persons." Dr. Kirkham said that the officers'

"training was 'out of synch with the entire United States in terms of what police are being trained to do.'" Id. at 843. "Dr. Kirkham characterized the officers' actions in this case as diametrically opposed to proper police procedures, out of synch with the rest of the police profession, and 'plain foolishness.'" Id. at 844. The Tenth Circuit considered this evidence to be "sufficient to support an inference that the need for different training was so obvious and the inadequacy so likely to result in violation of constitutional rights that the policymakers of the City could reasonably be said to have been deliberately indifferent to the need." Id.

Regarding the City's inadequate training, Plaintiffs expressly incorporate the entirety of Gregory G. Gilbertson, M.S.'s expert report (PX 11) into this section, seeing as Mr. Gilbertson's fact-intensive and critical analysis of the City's training and response to the incident at bar clearly shows that summary judgment is improper. While the Court is well-guided to review and analyze the entirety of the Gilbertson Report, Plaintiffs would highlight the provisions from pages 23-25 of the report, which clearly walk through the deficient policies, procedures, orders, and supervision of the City's officers as to the physical possession and availability of intermediate force weapons, a lack of any policies regarding Excited Delirium, and a lack of having clearer guidelines and requirements for handling calls for persons in crisis. *See* PX11, Gilbertson Report at pp. 23-25 (¶¶67-75) and *Cf.* Doc. 64-8 (City's Policy on Mental Health Procedures and the Crisis Intervention Team (CIT) Program).

In light of this legal background, a reasonable jury can conclude that the City's failure to train Box and Scherman constituted deliberate indifference. Despite the

advancements of training material for dealing with mentally ill and/or unstable individuals, the City did not provide adequate training to its officers on this subject matter. Even though the City had its officers attend mental health training blocks and offered additional CIT training, the City did not take any steps to ensure that its officers understood or otherwise were able to practice and implement these policies and did not require CIT trained officers answers calls involving individuals in crisis. It was foreseeable to the City that its officers would encounter mentally ill and/or unstable individuals in the field and need to assess and understand how to approach those incidents without using excessive force.

      D. <u>Deliberate Indifference – Use of Force</u>

Plaintiffs have also established that the City's inadequate training of its officers and its policies, practices, and customs regarding use of force demonstrates deliberate indifference.

The City lacked of a policy requiring additional less lethal use of force tools and lack of training on using intermediate levels of force. Scherman immediately resorted to deadly force when confronted with Isaiah who was unarmed and flailing his arms because of the City's lack of policies and training. The City's training that was given to its officers was nevertheless substantively inadequate. *See* <u>Allen</u>, 119 F.3d at 844 ("The City points to evidence that the officers included many hours of training, including training on use of deadly force and dealing with upset or mentally disturbed people, but that cannot rebut the inference that the training was inadequate because it does not address the content of that training.").

Similar to Section IV(D), above, Plaintiffs would direct the Court to pages 23-25 of Mr. Gilbertson's report, which which clearly walk through the deficient policies, procedures, orders, and supervision of the City's officers as to the physical possession and availability of intermediate force weapons, a lack of any policies regarding Excited Delirium, and a lack of having clearer guidelines and requirements for handling calls for persons in crisis. *See* PX11, Gilbertson Report at pp. 23-25 (¶¶67-75). Although Plaintiffs have advanced their failure to train claims on both (1) crisis intervention and (2) use of force grounds, these cited sections from the Gilbertson Report are nevertheless connected and relevant to assess each of these failure to train claims.

E.   <u>Causal Link</u>

Fourth, there is a direct causal link between the policies, practices, and customs at issue and Isaiah's death. Had officers such as Box and Scherman been properly trained, they would have handled the events of April 29, 2019 much differently, and Isaiah would not have been fatally shot that afternoon. Plaintiffs would again cite to the Gilbertson Report, which specifically opined that the City's deficient training and policies "contributed to this outcome, specifically the weapons policy and the policies and training pertaining to mental health and people in crisis." *See* PX11, Gilbertson Report at p. 25 (¶76).

In light of this factual record, a reasonable jury could conclude that the City is subject to municipal liability for its inadequate training program as to crisis intervention and use of force. For that reason, the City's Motion should be denied.

**V.**     **The City Violated Isaiah's Rights Under the Equal Protection Clause**

The Equal Protection Clause from the Fourteenth Amendment generally requires similar treatment among similarly situated persons, which limits a state's ability to burden a fundamental right or to target a suspect class. *See* Romer v. Evans, 517 U.S. 620, 631 (1996); City of Cleburne v. Cleburne Living Ctr. 473 U.S. 432, 439 (1985). If the challenged government action involves a suspect class (such as race or national origin) or interferes with a fundamental right, more rigorous strict scrutiny is applied. Price-Cornelison v. Brooks, 524 F.3d 1103, 1109 (10th Cir. 2008) (*citing* Johnson v. California, 543 U.S. 499, 505 (2005)). Strict scrutiny requires that the City's acts and resultant effects therefrom be "precisely tailored to serve a compelling government interest." Fisher v. Univ. of Texas at Austin, 570 U.S. 297, 308 (2013) (citations omitted). *See, e.g.*, Brown v. Montoya, 662 F.3d 1152, 1172-73 (10th Cir. 2011) ("[T]o assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them.").

For equal protection purposes, Isaiah belonged to a suspect class due to his African-American race. Isaiah was treated differently from others not of his race who were similarly situated to him in other encounters with the City's police officers. Specifically, on June 22, 2019, the City's officers previously encountered a 19-year-old white suspect named Jackson Morris. According to the Incident Report and other public accounts, one of the City's officers and two University of Central Oklahoma officers responded to a call about a many acting "crazy" on E Edwards Street in Edmond. The caller stated that the man, her boyfriend, was high on acid. Upon arrival to the scene, the City's officers noted that Morris

was jumping up and down in the yard of a home. Morris then jumped through a storm door, which shattered the glass and cut his legs. After shattering the glass, Morris allegedly shot a gun at the City's officers, who had to take shelter behind patrol cars. Morris ran out of the house and then paced back and forth, ignoring commands from the officers present.

Despite all of this, the officers eventually only tased Morris twice, physically restrained him on the ground, and were able to take Morris into custody without killing him. *See* PX 12, Jackson Morris Incident Report.[2] Some of the media and others in the community have questioned the City's use of force when comparing the Morris incident with the death of Isaiah at bar. *See, e.g.* Dulaney, Josh. *Some see race at play in Edmond police tactics*, The Oklahoman. June 25, 2019 (available at https://www.oklahoman.com/article/5634694/some-see-race-at-play-in-the-difference-with-edmond-police-tactics). Furthermore, no legitimate argument can be advanced that Isaiah's fundamental rights to life, liberty, and not being subject to excessive and deadly force by the state were not implicated when he was killed. The disparate treatment of Isaiah Lewis and Jackson Morris show that City has wrongfully treated Isaiah differently. Indeed, Isaiah was never armed, was never alleged to be armed, and never engaged any police officer or other person with a weapon. Morris, however, directly attempted to murder police officers. Somehow, Isaiah lost his life and Morris is still alive today. This is direct

---

[2] This document was produced confidentially pursuant to the Protective Order entered in this case. On June 1, 2021, Plaintiffs communicated their intent to file this document, PX 12, under seal to all counsel. As of the filing of this Response brief, Box and Scherman's counsel noted no objection. Plaintiffs anticipate hearing from the City's counsel on or soon after June 2, 2021, after which they will promptly seek to file PX 12 under seal.

evidence of a racial animus that results in an unequal application of the law and police practices.

For these reasons, the City's actions and disparate treatment of Isaiah cannot be adjudicated at summary judgment. Thus, Plaintiffs request that this Court deny the City's Motion regarding their equal protection claim.

### VI.      The City was Negligent Through the Acts of Box and Scherman

As this Court is well familiar with, a party claiming damages as a result of a negligence claim has the burden of proving each of the following propositions: First, that they have sustained injury; Second, that the party from whom they seek to recover was negligent; and third, that such negligence was a direct cause of the injury sustained by the claiming party. OUJI-CIV 9.1 (3d ed). "Negligence" is the failure to exercise ordinary care to avoid injury to another's person or property. "Ordinary care" is the care which a reasonably careful person would use under the same or similar circumstances. OUJI-CIV 9.2 (3d ed).

The City is negligent through the acts and omissions of Box and Scherman, who were acting within the course and scope of their employment at all pertinent times giving rise to this lawsuit. Thus, pursuant to *respondeat superior* liability, the negligent acts and omissions of Box and Scherman are sufficient to hold the City, their employer, liable. *See* Fox v. Mize, 2018 OK 75, ¶8, 428 P.3d 314, 319 (*citing* Mid-Continent Pipeline Co. v. Crauthers, 1954 OK 61, ¶19, 267 P.2d 568, 571) ("[R]espondeat superior holds the master

liable for injury proximately resulting from the negligent act of a servant done while in the course and scope of the servant's employment with the master.").

For these reasons, Plaintiffs expressly incorporate their arguments made in response to Box and Scherman's Motion for Summary Judgment regarding the constitutional violations committed by Box and Scherman. Given that Plaintiffs have demonstrated that Box and Scherman violated Isaiah's constitutional rights with deliberate indifference, this greatly exceeds the required standards for Plaintiffs' state law negligence claim asserted against the City from the same conduct. Thus, this Court should deny the City's Motion for Summary Judgment as to Plaintiffs' negligence claim.

## **CONCLUSION**

For the reasons stated herein, Plaintiffs Vicki Jo Lewis and Troy Levet Lewis, individually and as Co-Personal Representatives of the Estate of Isaiah Mark Lewis respectfully request that this Court deny the City of Edmond, Oklahoma's Motion for Summary Judgment.

Respectfully submitted,

s/ Geoffrey A. Tabor

Andrew M. Stroth, IL Bar # 6276013
Carlton Odim, IL Bar # 6182368
Action Injury Law Group, LLC
191 North Wacker Drive Suite 2300
Chicago, IL 60606
Tel: (312) 771-2444
Fax: (312) 641-6866

astroth@actioninjurylawgroup.com
carlton@actioninjurylawgroup.com

and

Woodrow K. Glass, OBA # 15690
Geoffrey A. Tabor, OBA# 32880
Ward & Glass, LLP
1601 36th Avenue
Norman, OK 73072
(405) 360-9700
woody@wardglasslaw.com
geoffrey@wardglasslaw.com

and

David J. Batton, OBA #11750
Law Office of David J. Batton
P.O. Box 1285
(330 W. Gray, Suite 304)
Norman, OK 73070
Tel: (405) 310-3432
Fax: (405) 310-2646
dave@dbattonlaw.com

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I certify that I filed the foregoing document on June 1, 2021, through the Court's CM/ECF system, thereby causing electronic service on all parties by their counsel of record.

s/ Geoffrey A. Tabor