## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| VICKI JO LEWIS, individually and as co-Personal Representative of the ESTATE OF ISAIAH MARK LEWIS, deceased; and TROY LEVET LEWIS, individually and as co-Representative of the ESTATE OF ISAIAH MARK LEWIS, deceased, | ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. CIV-19-489-R |
| | ) | |
| CITY OF EDMOND, an Oklahoma Municipal Corporation; POLICE SGT. MILO BOX and POLICE OFFICER DENTON SCHERMAN, individually, | ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

Before the Court are motions for summary judgment filed by Defendant City of Edmond ("Edmond"), Doc. No. 64, Officer Denton Scherman and Sergeant Milo Box, Doc. No. 65. Plaintiffs, representatives of the Estate of Isaiah Lewis, filed responses to both motions in Doc. Nos. 82 and 83, to which Defendants filed replies in Doc. Nos. 87 and 88. The Court finds as follows.

### I.    Background

Isaiah Lewis arrived at his girlfriend's house around 10:30 a.m. on April 29, 2019, and she immediately noticed he was acting strangely. Doc. No. 83-11, p. 5. Lewis "seemed troubled by something[,]" and asked to look at his girlfriend's cell phone. *Id.* Lewis's request led to a confrontation between the two. *Id.* Meanwhile, a food delivery driver

waiting outside heard the altercation, ran down the street to a neighbor's house, and asked the neighbor to call the police. *Id.* p. 6. The caller stated that a young man was "beating up" a girl, even though Lewis's girlfriend later explained that the two "were fine" and that neither "needed medical treatment." Doc. Nos. 65, p. 6 ¶ 1 & Doc. No. 82, p. 7 ¶ 1.

In response to the 911 call, "Edmond police officers were sent by radio dispatch" to the neighbor's home around 1:04 p.m. Doc. No. 64, p. 9 ¶ 5. While the officers headed to the neighbor's home, Lewis removed his clothing and fled the area on foot. *Id.* ¶ 6. According to the Plaintiffs, Lewis continued "intermittently running naked around the neighborhood and hiding, and generally behaving strangely" for about one hour. Doc. No. 82, p. 8 ¶ 9.

Officer Denton Scherman and Sergeant Milo Box assisted in the search for Lewis and eventually spotted him in a yard in a nearby neighborhood. Doc. Nos. 65, p. 7 ¶ 11 & Doc. No. 82, p. 9 ¶ 11. As the officers "drove past Lewis, Box exited the vehicle, identified himself as a police officer," and commanded Lewis to stop and get on the ground. *Id.* ¶ 17. Rather than comply, Lewis turned toward the front door of the nearest home and "forced his way into a residence located at 520 Gray Fox Run, Edmond, Oklahoma." *Id.* ¶¶ 18, 21.

After watching him physically break through the front door, Box ascertained that Lewis did not live at 520 Gray Fox Run, and thus, followed Lewis into the home. *Id.* ¶¶ 22, 30. As Box moved down the entry hallway, he observed Lewis attempting to exit the back door and again commanded him to stop and get on the ground. *Id.* ¶¶ 30–32. In response, Lewis turned toward Box and charged at him. *Id.* ¶ 33. As he charged, "Box

deployed his taser." *Id.* ¶ 34. Lewis and Box then fought in the living room. *Id.* ¶ 42. Box

deployed his taser once again, but the taser had no effect. *Id.*

Around this time, Scherman walked down the entry hallway into the living room of

the home and observed "Lewis pummeling Box." *Id.* ¶¶ 38, 40, & 41. Lewis "continued to

strike Box in the head, face and neck," and Box attempted to use his taser to "drive stun"

Lewis. *Id.* ¶¶ 43–44. The taser failed to subdue Lewis and Box disappeared from

Scherman's line of sight. *Id.* ¶ 48. Lewis then turned toward Scherman and Scherman drew

his firearm. *Id.* ¶¶ 48, 51.

From this point, the parties' factual assertions diverge. Scherman asserts that Lewis

charged toward him "like a football player" and that in response, Scherman "discharged

his firearm." Doc. No. 65, p. 14 ¶¶ 51–54. Scherman alleges that he then "backed toward

the entryway and front door while continuing to give Lewis commands to stop and get on

the ground[,]" but that Lewis "continued to barrel toward [him] managing to punch [him]

once in the face […]." *Id.* ¶¶ 55–56. Scherman explains he then shot Lewis four more times

"with all four shots hitting Lewis in the front of his body" and that "Lewis did not stop

attacking Scherman until the fifth shot was fired." *Id.* ¶¶ 58–60.

According to the Plaintiffs, however, "Scherman's account of the shooting is

contradicted by physical, forensic evidence as analyzed by [expert] Dr. Filkins, and the

other circumstances surrounding Scherman's deadly force." *Id.* ¶ 54. The Plaintiffs dispute

i) that Lewis charged Scherman in a tackling position, ii) that Lewis punched Scherman in

the face, and iii) any assertion by Scherman "meant to imply [Lewis] was continuing to

charge and punch Scherman while/after [Lewis] was being shot and fatally wounded by

Scherman." *Id.* ¶ 56. In his report, Plaintiffs' expert Dr. James Filkins explains that Lewis's gunshot wounds are inconsistent with Scherman's testimony that he shot Lewis from close range, that Lewis charged him in a tackling position, and that Lewis was close enough to land a punch on Scherman's face. Doc. No. 62-1, p. 7. Plaintiffs also dispute that Scherman verbally commanded Lewis to "stop" and "get on the ground" by arguing that "Box, who was within earshot in the adjacent room, did not hear Scherman say anything at any time in the home." Doc. No. 82, p. 13 ¶ 50. The officers argue in response that Lewis rendered Box "temporarily unconscious[,]" and that therefore, Box could not have heard Scherman's warnings. Doc. No. 88, p. 3 ¶ 50.

Still, the Plaintiffs do not dispute that after his fight with Box in the living room, Lewis turned toward Scherman and advanced in his direction as Scherman backed down the entry hallway toward the front door. Doc. No. 88, p. 5 ¶ 11. Four gunshot wounds in the front of Lewis's body and the bullet casings recorded in the Edmond police department's crime scene sketch confirm this account. Doc. No. 65, p. 10. Instead of arguing that Lewis did not advance toward Scherman, the Plaintiffs state that Lewis "mov[ed] his arms in a windmill motion" rather than in a tackling position and that Lewis was more than one and a half to two feet away from Scherman when Scherman discharged his firearm four times. Doc. No. 82-8, p. 9. The parties agree that the incident ended at the front door when Lewis fell to the ground. Doc. No. 65, p. 15 ¶ 62.

Following the deadly encounter, Plaintiffs filed suit against Edmond, Officer Scherman and Sergeant Box. Doc. No. 1. Plaintiffs brought a state law negligence action against Edmond, in addition to claims under 42 U.S.C. § 1983 alleging a failure to train its

police officers and a violation of the equal protection clause. *Id.* Plaintiffs also filed claims for excessive use of force against Box and Scherman. *Id.* In anticipation of trial, Plaintiffs and Defendants retained experts. Edmond retained Steve Ijames, whose proposed testimony supports the adequacy of the Edmond police officers' training and response in Box and Scherman's encounter with Lewis. Doc. No. 64, p. 27. However, Plaintiffs' expert Gregory Gilbertson plans to testify that the "City's deficient training and policies 'contributed to [Lewis's death], specifically the weapons policy and the policies and training pertaining to mental health and people in crisis.'" Doc. No. 83, p. 19 (citing Doc. No. 83-11, p. 25 ¶ 76.).

Additionally, Defendants retained expert Thomas C. Kupiec to testify regarding the levels of THC in Lewis's body at the time of the accident, arguing that the level of narcotics in his body is relevant to support the officers' perception of Lewis's mental state. Doc. No. 76, p. 6. Lastly, as discussed above, Plaintiffs plan to utilize expert Filkins to dispute Scherman's testimony.

Edmond, Box, and Scherman now seek summary judgment on each of Plaintiffs' claims. Doc. Nos. 64 & 65.

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th

Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). While the Court construes all facts and reasonable inferences in the light most favorable to the non-moving party, *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712–13 (10th Cir. 2014), "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III.    Excessive Force Claims

Sergeant Box and Officer Scherman assert that qualified immunity precludes Plaintiffs' claim for excessive force against them. Doc. No. 65, p. 15. If a court finds that qualified immunity applies to claims against officers, the finding of qualified immunity "preclude[s] the imposition of municipal liability" against the city. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 n.8 (10th Cir. 2004). Thus, if Box and Scherman are entitled to summary judgment here, the municipal liability claims against Edmond fail. For this reason, the Court first addresses whether Box and Scherman are entitled to summary judgment.

Qualified immunity "protect[s] officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald,* 457 U.S. 800, 807 (1982). When a defendant asserts qualified immunity at summary judgment, the plaintiff must establish that the defendant violated a constitutional right and that the right was clearly established at the time of the constitutional violation. *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009); *see also Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) ("[B]y asserting the qualified-

6

immunity defense, Sheriff [ ] triggered a well-settled twofold burden that [plaintiff] was compelled to shoulder: not only did she need to rebut the Sheriff's no-constitutional-violation arguments, but she also had to demonstrate that any constitutional violation was grounded in then-extant clearly established law."). Ordinarily, "[i]n this circuit, to show that a right is clearly established, the plaintiff must point to 'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Garcia v. Escalante*, 678 F. App'x 649, 653–54 (10th Cir. 2017) ((citing *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 427 (10th Cir. 2014))).

The Court is free to address either prong of the qualified immunity analysis first. Here, Plaintiffs allege Box and Scherman violated the Fourth Amendment by employing excessive force. Specifically, Plaintiffs argue that Box utilized excessive force when he "created and escalated the situation […] that Defendants have now used to justify their use of force" and that Scherman employed excessive force when he fatally shot Lewis while Lewis was "unarmed, in crisis and never posed an imminent threat." Doc. No. 82, p. 21. The Tenth Circuit has explained that when appropriate, courts may "analyze[ ] the conduct of each officer individually in excessive force cases at the summary judgment" stage. *Pauly v. White*, 814 F.3d 1060, 1071 (10th Cir. 2016), *cert. granted, rev'd on other grounds*, 137 S. Ct. 548 (2017). In light of the strong distinction between Box's conduct—announcing his presence and commanding Lewis to "get down"—and Scherman's—discharging his

firearm five times—the Court addresses the excessive force claim against each officer separately.

### A) Sergeant Box

The Plaintiffs allege that Sergeant Box violated Lewis's Fourth Amendment rights when he shouted commands after exiting his vehicle because it "created and escalated the situation […] that Defendants [ ] used to justify their use of force." Doc. No. 82, p. 21.

To be sure, the fact that Box did not employ deadly force does not, by itself, immunize him from liability under § 1983. *See, e.g.*, *Diaz v. Salazar*, 924 F. Supp. 1088, 1097 (D.N.M. 1996) (citing *Starks v. Enyart,* 5 F.3d 230 (7th Cir. 1993); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553 (1st Cir. 1989); *Grandstaff v. Borger,* 767 F.2d 161 (5th Cir. 1985); and *Strachan v. City of Federal Heights,* 837 F. Supp. 1086 (D. Colo. 1993)). In determining whether an officer employed excessive force, the Tenth Circuit has considered "'whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (citing *Allen v. Muskogee,* 119 F.3d 837, 840 (10th Cir. 1997)) (quoting *Sevier v. City of Lawrence,* 60 F.3d 695, 699 (10th Cir. 1995)). In *Medina*, the Tenth Circuit explained that "in order to constitute excessive force, the conduct arguably creating the need for force must be immediately connected with the seizure and must rise to the level of recklessness, rather than negligence." *Medina*, 252 F.3d at 1132; *see also Sevier,* 60 F.3d at 699 n. 7 ("Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983.").

In *Pauly v. White*, the Tenth Circuit explained how courts should analyze whether a nonshooting officer's conduct was reckless:

> [the nonshooting officers] may be [ ] liable if their conduct immediately preceding the shooting was the but-for cause of [the suspect's] death, and if [the suspect's] pointing a gun at the officers was not an intervening act that superseded the officers' liability. Foreseeable intervening forces are within the scope of the original risk, and ... will not supercede the defendant's responsibility.

*Pauly*, 814 F.3d at 1072 (internal quotation marks and citation omitted). In *White*, officers approached the home of Samuel and Daniel Pauly after a 911 caller alleged that Daniel appeared to be driving intoxicated. *Id.* at 1065–66. Despite agreeing that "there was not enough evidence or probable cause to arrest [Pauly]," multiple officers approached Daniel and his brother's home at night, in the rain, and without turning on any warning lights or announcing themselves as police officers. *Id.* Believing the officers to be intruders, the Pauly brothers retrieved their own guns, fired warning shots, and pointed a handgun at an officer. *Id.* at 1066-67. Two of the officers then shot at Samuel, and one officer's shot killed him. *Id.* at 1067. In assessing the conduct of the nonshooting officer, the Tenth Circuit explained that fact questions remained precluding summary judgment as to whether an officer could reasonably foresee that shouting "we got you surrounded. Come out or we're coming in[ ]" would cause the brothers to "defend their home with deadly force." *Id.* at 1074.

Conversely, the Tenth Circuit affirmed the district court's grant of summary judgment for the officers in *Thomson v. Salt Lake County*. 584 F.3d 1304, 1320 (10th Cir. 2009). In *Thomson*, the Plaintiffs alleged that releasing a police dog without warning and

failing to negotiate with an armed, agitated suspect running through a neighborhood did not "recklessly create[ ] the need for deadly force." *Id.* Specifically, the court explained that "it was objectively reasonable for the officers to take the steps that they did to locate an armed man who was agitated and running through a neighborhood." *Id.* at 1321; *see also Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) (finding reasonable an officer's decision to coax "an armed and agitated" suspect from a locked room).

Here, the Court finds Sergeant Box's conduct was objectively reasonable. While Plaintiffs argue that Lewis was not "consciously evad[ing]" officers, the record is clear that Lewis did not comply with commands from police as he continued to flee from officers by "running through yards and hiding in a wooded area[.]" Doc. No. 82, p. 8 ¶ 8. Further, prior to spotting Lewis, Box and Scherman knew that a call referencing a domestic disturbance triggered the officers' original dispatch, and that Lewis had been running through neighborhoods naked for the last hour. Doc. No. 65, pp. 6 ¶¶ 6, 9. Construing the facts in the Plaintiffs' favor, after spotting Lewis, Box then "jumped from the vehicle before it came to a complete stop, shouted commands at [Lewis] and pointed his taser at [him]." Doc. No. 82, p. 9 ¶ 10. In *Thomson*, the Tenth Circuit found it objectively reasonable when officers released a police dog without warning and failed to negotiate with an armed and agitated suspect running through a neighborhood. 584 F.3d at 1320. Similarly, here, it was objectively reasonable for Box to exit his vehicle, announce his presence, and point a taser at Lewis.

Further, it was not reasonably foreseeable that Box's conduct would lead to a deadly encounter. Unlike in *Pauly*, where officers approached Pauly and his brother's home at

night, in the rain, and without turning on any warning lights, Box stepped outside of his vehicle in the middle of the afternoon and announced his presence, and commanded the naked Lewis to "get down." 814 F.3d at 1075–76. The Court must "evaluate the officer's reasonableness from the on-scene perspective, not with the advantage of 20/20 hindsight." *Jiro,* 392 F.3d at 418. Even though Lewis was unarmed, he had been fleeing officers for over an hour after the police received report of a domestic disturbance. As the court explained in *Thomson*, Box "adequately performed his duties as a reasonable law enforcement officer by taking steps to prevent [a fleeing] suspect from escaping." *Id.* Accordingly, the Court finds that as a matter of law, Box did not violate Lewis's constitutional rights by announcing his presence and commanding him to "get down." For this reason, Box is entitled to summary judgment on Plaintiffs' excessive force claim against him.[1]

### B) Officer Scherman

When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Tenth Circuit has "held [that] the *Graham* framework allows the use of deadly force where "a reasonable officer ... would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Estate. of Smart v. City of Wichita*, 951 F.3d 1161, 1171 (10th Cir. 2020) (citing *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir.

---

[1] Because Box did not violate Lewis's Fourth Amendment rights, the Court need not address whether the law was clearly established.

1995)). Courts analyze whether an officer's use of force was excessive by asking whether it was "objectively reasonable" in light of the facts and circumstances confronting the officer, without regard to the officer's underlying intent. *Id.* at 388. The Tenth Circuit has explained that

> [t]o state an excessive force claim under the Fourth Amendment, plaintiffs must show *both* that a seizure occurred and that the seizure was unreasonable. In assessing reasonableness, this court looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment. The inquiry is an objective one, and one that considers the totality of the circumstances. Furthermore, reasonableness is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

*Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (internal citations and quotation marks omitted). In *Graham*, the Supreme Court outlined the applicable factors for evaluating excessive force claims: "[i] the severity of the crime, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. The Court addresses each factor in turn.

To begin with, the Plaintiffs argue that the severity of the crime favors Lewis because he had not committed any crime, "let alone a severe one." Doc. No. 82, p. 26. Further, the Plaintiffs urge that the officers did not have probable cause to arrest Lewis or take him into custody because rather than exhibiting criminal conduct, it was "apparent [his] conduct was attributable to the crisis he was experiencing." *Id.* p. 27. Scherman disagrees, arguing that the severity of the crime weighs against Lewis for several reasons. First, the initial 911 call involved allegations of domestic abuse, prompting the dispatch of

officers to Lewis's girlfriend's neighborhood. Doc. No. 65, p. 16. Second, prior to spotting Lewis, Scherman argues he was aware Lewis had trespassed in multiple yards and indecently exposed himself. Doc. No. 65, p. 17; Doc. No. 88, p. 6. Lastly, Scherman states that "Lewis physically assaulted and battered Box" and "[a]ssault and battery on [a] police officer is a felony." Doc. No. 65, p. 18.

Courts in the Tenth Circuit recognize a distinction between misdemeanors and felonies when evaluating the severity of the crime at issue. *K-9 Unit Deputy Sanders*, 989 F.3d at 1170. Initially, officers were dispatched on a call alleging a domestic disturbance, which somehow contributed to Lewis's flight. Then, it is unclear where Lewis went after the officers' initial dispatch into his girlfriend's neighborhood, but it is undisputed that Lewis then embarked on a one-hour period of naked flight through the woods and neighborhoods eventually leading to Scherman and Box spotting him in the yard at 520 Gray Fox Run. Thus, the first undisputed "crime at issue" was indecent exposure, a misdemeanor, which weighs against the use of force. *See Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018).

It is also undisputed that once Sergeant Box commanded Lewis to "get on the ground" in the yard at 520 Gray Fox Run, Lewis evaded arrest, trespassed, intentionally broke into and entered the home,[2] and assaulted and battered Sergeant Box. Though his

---

[2] "Every person who, without the intention to commit any crime therein, shall willfully and intentionally break and enter into any building, trailer, vessel or other premises used as a dwelling without the permission of the owner or occupant thereof, except in the cases and manner allowed by law, shall be guilty of a misdemeanor." Okla. Stat. tit. 21 § 1438(B).

initial undisputed crime was a misdemeanor, when Lewis turned to face Scherman after "pummeling Box," he had engaged in felonious activity.[3] Accordingly, taken together, the first factor weighs in favor of Officer Scherman employing some force.

The second *Graham* factor is whether the officer faced an immediate threat. The Tenth Circuit has previously explained that when "evaluating this factor, [courts] must look at whether the officers [or others] were in danger at the precise moment that they used force." *K-9 Unit Deputy Sanders*, 989 F.3d at 1170 (internal quotation marks and citations omitted). Weighing whether the officer faced an immediate threat "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force," *Bond v. City of Tahlequah, Okla.*, 981 F.3d 808 (10th Cir. 2020). In reviewing the degree of threat, the court considers:

> (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

*Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Here, though the parties dispute the exact timing and sequence of events, the undisputed facts reveal that Scherman's interaction with Lewis began when he witnessed Lewis physically burst through the front door of 520 Gray Fox Run. Doc. Nos. 65, pp. 8–

---

[3] "Every person who, without justifiable or excusable cause knowingly commits battery or assault and battery upon the person of a police officer, sheriff, deputy sheriff, highway patrolman, corrections personnel, or other state peace officer employed or duly appointed by any state governmental agency to enforce state laws while the officer is in the performance of his or her duties, upon conviction, shall be guilty of a felony punishable by imprisonment in the custody of the Department of Corrections of not more than five (5) years or county jail for a period not to exceed one (1) year, or by a fine not exceeding Five Hundred Dollars ($500.00), or by both such fine and imprisonment." Okla. Stat. tit. 21 § 649 (B).

9 ¶¶ 18, 21 & Doc. No. 82, pp. 8–9 ¶¶ 18, 21. Next, Scherman walked into the entry hallway of the home to provide Box with backup and witnessed Lewis "pummeling Box" until Box disappeared from Scherman's line of sight. *Id.* ¶¶ 38, 40, & 41. Then, Lewis turned and advanced towards Scherman. Doc. No. 88, p. 5 ¶ 11. Scherman backed down the entry hallway toward the front door and employed deadly force at some disputed distance. Doc. No. 88, p. 5 ¶ 11.

The first two elements cut in Lewis's favor—the fact that he was unarmed is undisputed, and therefore, Scherman could not have ordered him to drop any weapon. Further, without a weapon, Lewis could not have made hostile motions with a weapon towards Scherman. However, the third factor weighs in Scherman's favor, because even accepting the Plaintiffs' expert's conclusion that Scherman and Lewis were further than two feet apart, the two were still confined in a small space in the entry hallway of 520 Gray Fox Run. Finally, the fourth element is unclear. While a reasonable jury could arguably conclude that when Lewis "mov[ed] his arms in a windmill motion[,]" he did not pose a level of danger requiring deadly force, Lewis had just pummeled Box, and a reasonable, undersized officer without the benefit of hindsight could have believe he faced danger of serious bodily harm. Ultimately, the Court finds that material fact disputes preclude the immediate threat factor from favoring either party.

The final *Graham* factor addresses whether Lewis actively resisted arrest or attempted to evade arrest by flight. This factor clearly favors Scherman. Here, the genesis of the encounter between Lewis and Scherman is based on Lewis's evasion and resistance of multiple officers. Lewis actively evaded officers for over an hour as he ran through

15

neighborhoods naked. Doc. No. 82, p. 8 ¶ 9. Further, Lewis resisted arrest when Box gave him multiple commands to "stop and get on the ground." Accordingly, Lewis's evasion weighed in favor of the use of force.

After weighing the *Graham* factors, the Court finds that when construing the facts in the light most favorable to the Plaintiff, a reasonable jury could conclude that though force was clearly necessary, *deadly force* was not justified against the naked, unarmed Lewis "at the precise moment[s]" Scherman discharged his firearm. *See, e.g.*, *Estate of Harmon v. Salt Lake City*, 471 F. Supp. 3d 1203, 1219 (D. Utah 2020) (explaining that the court "analyze[s] these factors at the precise moment that the officer used force.") (emphasis added). Construing the facts in Plaintiffs' favor, after Scherman first shot Lewis, Lewis no longer "continued to barrel toward [him] managing to punch [him] once in the face […]." Doc. No. 82, p. 14 ¶ 56. A reasonable jury could conclude that, after Scherman discharged his firearm once, Lewis no longer presented a "threat of serious physical harm." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Fancher v. Barrientos*, No. CIV. 11-118 LH/LAM, 2012 WL 12838429, at *9 (D.N.M. June 13, 2012), ("[C]ircumstances may change within seconds eliminating the justification for deadly force.") (internal citations omitted), *aff'd*, 723 F.3d 1191 (10th Cir. 2013). Accordingly, whether the officer faced an immediate threat "is undoubtedly the most important and fact intensive factor" and here, genuine factual disputes preclude the Court from finding that the factor favors either party. *See Bond*, 981 F.3d at 820. The Court now turns to whether the law was clearly established as to Scherman.

When evaluating whether the law is clearly established, prior cases need not be factually identical to the scenario facing the officer but must provide "fair warning to the defendants that their alleged [conduct] was unconstitutional." *Bond,* 981 F.3d at 824–25 (internal citations and quotation marks omitted); *see also City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 613 (2015) ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."); *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019) ("The Supreme Court has warned against defining clearly established rights at a high level of generality.") (internal citations and quotation marks omitted).

Plaintiffs argue that Tenth Circuit decisions clearly established at the time of the encounter between Lewis and Scherman provided notice to Scherman that deadly force would violate Lewis's Fourth Amendment rights. Doc. No. 82, pp. 29–34. Specifically, Plaintiffs cite *Allen v. Muskogee,* 119 F.3d 837 (10th Cir. 1997), *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019), *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) (unpublished), and *Bond v. City of Tahlequah, Okla.*, 981 F.3d 808 (10th Cir. 2020). *Bond*, a 2020 decision, had not been decided at the time of the encounter, and is therefore inapplicable. However, *Estate of Ceballos* is instructive. In *Ceballos*, officers were dispatched to a home where the suspect allegedly carried a baseball bat and was "acting crazy." 919 F.3d at 1209. After repeatedly ordering the suspect to drop his bat, one officer drew a taser and another drew a gun. *Id.* at 1210–1211. The suspect then moved towards the officers, and one officer fired his gun, killing Ceballos. *Id.* at 1211. The Tenth Circuit found that *Allen v. Muskogee* would have placed "an objective officer in [the shooting

officer's] position" on notice that his conduct violated the Fourth Amendment. *Id.* at 1215. Accordingly, the court affirmed the district court's decision to deny the officer qualified immunity. *Id.* at 1218.

In *Allen v. Muskogee*, a woman requested police assistance at her home because her brother was armed, threatened family members, and parked outside in her driveway. 119 F.3d at 839. The officers arrived on the scene, knowing the suspect was armed and suicidal, and proceeded to surround the vehicle. *Id.* Two officers reached into the vehicle, one grabbing the suspect's arm and another "attempt[ing] to seize [the suspect's] gun." *Id.* Meanwhile, a third officer opened the passenger door, at which point the suspect pointed his gun at an officer and "swung the gun toward" two other officers. *Id.* Two of the officers quickly fired back twelve shots, striking the suspect four times. *Id.* The Tenth Circuit reversed the district court's grant of summary judgment for the officers because the court reasoned that a reasonable jury could conclude "the officers' actions were reckless and precipitated the need to use deadly force" when upon the officers' arrival, they aggressively approached and surrounded an armed, dangerous individual. *Id.* p. 841 (citing *Sevier*, 60 F.3d at 699).

Construing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that no reasonable officer could have believed that the use of lethal force was lawful when Scherman encountered Lewis at 520 Gray Fox Run. *See Estate of Ceballos*, 919 F.3d at 1220. Even if *Allen* did not provide Scherman with "fair warning" that his conduct could violate Lewis's constitutional rights, *Estate of Ceballos* surely did. In *Ceballos*, the Court explained that an objective officer should have been on notice that

using deadly force against a man that was "acting crazy," carrying a bat, and moving towards officers violated the Fourth Amendment. 919 F.3d at 1209–1211. Here, it is undisputed Lewis was unarmed, and even though Lewis was approaching Scherman, an objective officer would have been on notice that employing deadly force in that "precise moment" violated the Fourth Amendment. Accordingly, the Plaintiffs have met their burden on the clearly established prong against Scherman, and therefore, summary judgment is inappropriate on Plaintiffs' excessive force claim against Officer Scherman.

Scherman also cites to cases from the Fifth and Sixth Circuits for the proposition that he is entitled to qualified immunity. The problem with Scherman's assertion, however, is that in each of his cited cases—*Schlabach*, *Colston*, and *Davenport*—the district court and the circuit court relied on video evidence to corroborate the testimonies of the defendant officers. *Mitchell v. Schlabach*, 864 F.3d 416 (6th Cir. 2017); *Davenport v. Causey*, 521 F.3d 544 (6th Cir. 2007); *Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997). Here, the Court lacks video evidence in the record. Further, because Plaintiffs' expert Dr. Filkins provides forensic evidence that contradicts Scherman's testimony, a genuine fact dispute precludes summary judgment.

For this reason, Scherman is not entitled to qualified immunity on Plaintiffs' excessive force claim against him. Therefore, Scherman's motion for summary judgment is DENIED, and the Court now turns to Plaintiffs' claims against Edmond.

## IV.    Municipal Liability Claim

To hold a municipality liable under § 1983, a plaintiff must "prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of

constitutional or other federal rights." *Cox v. Glanz*, 800 F.3d 1231, 1255 (10th Cir. 2015) (internal quotation marks and citation omitted). The Tenth Circuit has explained that

> [a] municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal citations omitted).

Here, Edmond argues summary judgment is appropriate on Plaintiffs' failure to train claim because all Edmond Police Department officers complied with CLEET training requirements and Edmond's expert Steve Ijames concluded that Edmond adequately trained its officers. Doc. No. 64, pp. 25–27. Plaintiffs respond that expert Gregory Gilbertson's report precludes summary judgment because a reasonable jury could conclude that Edmond failed to adequately train its officers and such failure to train caused Lewis's constitutional deprivation. Doc. No. 83, pp. 14–19.

To succeed against a municipality on a § 1983 claim for failure to train police officers in the use of force, Plaintiffs must first prove that the training was in fact inadequate. *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (internal citations omitted). Then, the plaintiff must satisfy the following requirements:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and

20

> recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (quoting *Allen v. Muskogee,* 119 F.3d 837, 841-42 (10th Cir. 1997) (citing *City of Canton,* 489 U.S. 378, 389–91 (1989))). While "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train[,]" *Connick v. Thompson*, 563 U.S. 51, 61 (2011), it is possible that "the need for more or different training is so obvious […] that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. In *City of Canton*, the Supreme Court further explained that if the need for different training is so obvious, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.*

Here, the Plaintiffs' evidence meets the first two requirements. With regard to the first factor, at the summary judgment stage, a reasonable jury could find Scherman exceeded the constitutional limitation on the use of force by unreasonably employing deadly force against Lewis, as discussed above. As to the second element, the Tenth Circuit has explained that encounters with mentally ill people qualify as a usual and recurring circumstance that police officers must deal with. *Brown v. Gray*, 227 F.3d 1278, 1288 (10th Cir. 2000) (citing *Allen,* 119 F.3d at 842)); *see also Simpson v. Little*, 500 F. Supp. 3d 1255, 1267 (N.D. Okla. 2020) (finding that the plaintiff satisfied the second element because

"[t]the highly predictable and patently obvious [consequence] of not having regular shoot don't shoot training is an officer using deadly force when not constitutionally authorized to do so.") Thus, the Court need only address whether Plaintiffs provided evidence of Edmond's deliberate indifference or a direct causal link between the failure to train and the alleged Fourth Amendment violation.

Deliberate indifference requires a showing that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need." *Brown*, 227 F.3d at 1288 (citing *City of Canton*, 489 U.S. at 390).

Summary judgment is inappropriate when a plaintiff identifies and provides evidence of specific training that is "out of synch with the entire United States in terms of what police are being trained to do." *See Allen*, 119 F.3d 837, 843 (10th Cir. 1997). In *Allen*, the Tenth Circuit reversed the district court's grant of summary judgment for the defendant City of Muskogee because there was "evidence presented […] that the officers received inadequate training on how to deal with mentally ill or emotionally upset persons who [were] armed with firearms." *Id.* at 842. The court reasoned that the plaintiff's expert provided evidence that, when viewed in the light most favorable to the plaintiff, created a genuine fact dispute precluding summary judgment. *Id.* at 843.

However, summary judgment is appropriate when a plaintiff only provides evidence of an "*absence* of specific training for [officers] that [ ] could have helped them during the encounter." *See Carr v. Castle*, 337 F.3d at 1230 (emphasis in original). In *Castle*, the

Tenth Circuit upheld the district court's grant of summary judgment for the city on the failure to train claim asserted against it because, unlike in *Allen*, the plaintiffs failed to provide evidence of improper training rising to a level of a constitutional violation. *Id.* Specifically, the plaintiff argued that the city had trained its officers to use deadly force, rather than to wound. *Id.* The court explained that

> [i]f the City had actually trained its Officers to "shoot until dead," Carr would have been able to survive summary judgment, for the City would obviously have been on notice of, and nonetheless consciously disregarded, the potential harm. But Carr's contention distorts not only the Officers' testimony but, more importantly, the nature of the training at issue.
>
> What the Officers' testimony really reveals is their understanding that they were ordered to shoot to kill only when they were confronted with situations that required the use of deadly force as discussed in *Tennessee v. Garner:* self-defense or the fleeing felon rule. In those situations officers are allowed to shoot to kill because the imminent danger to themselves or the community necessitates it. And such rules were meticulously described in the City's training materials.

*Id.* The court distinguished *Castle* from *Allen* when it explained that offering evidence "that well-trained officers would have performed differently under pressure does not rise to the legal standard of deliberate indifference on the part of the City[.]" *Id.* at 1230. Further, the Court found that the plaintiff did not show a "direct causal link" because while the plaintiff had been repeatedly shot in the back, there was no evidence that the officers were "trained by the City to shoot [someone] repeatedly in the back after he no longer posed a threat." *Id.* at 1232. The Court now turns to each of Edmond's alleged deficiencies in its training of officers.

The Court first notes that Professor Gilbertson's report is contradictory in certain important respects. Gilbertson begins his report by lauding the training of Box and

Scherman but ultimately condemns their actions as failing to comport with such training. Doc. No. 83-11, p. 14.  His report states that "[n]either Sergeant Box nor Officer Scherman can claim they were unfamiliar with mental illness or Excited Delirium as they […] both had been trained to recognize and respond to the same as part of the CLEET Academy training and additional mental health crisis intervention training through the Edmond Police Department." Doc. No. 83-11, p. 14. However, later in Gilbertson's analysis, he condemns Edmond because it did not have a "written policy on responding to persons experiencing Excited Delirium." Doc. No. 83-11, p. 26. As discussed above, when a plaintiff only provides evidence of the "*absence* of specific training for [officers] that [ ] could have helped them during the encounter[,]" summary judgment is appropriate. *Castle,* 337 F.3d at 1230. Thus, even assuming Gilbertson's latter account controls—that a written policy is preferable to actual in-person training—Plaintiffs fail to show that Edmond was deliberately indifferent in this regard.

Further, Gilbertson states that Edmond's policy was deficient because "it does not require the involvement of CIT-certified officers in" calls involving persons in crisis. Doc. No. 82, p. 26 ¶ 73. This fails to establish a "direct causal link" between the city's alleged deficiency and the encounter with Lewis because, as Gilbertson states, Sergeant Box "had completed specialized Crisis Intervention Team (CIT) training through the Edmond Police Department." Doc. No. 82-11, p. 16, ¶ 45. Thus, a CIT-certified officer *was on the scene* of the deadly encounter. *Id.* Further, Gilbertson stated that "[i]f either Scherman or Box had employed the verbal de-escalation they had been trained to utilize […] no force whatsoever may have been necessary." Doc. No. 83-11, p. 19. With this assertion,

Gilbertson admits that the absence of training was not "the moving force" behind the alleged constitutional violation. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). For this reason, summary judgment is appropriate in regard to Plaintiffs' contention that not requiring the involvement of CIT-officers directly caused Lewis's death.

Finally, the Court addresses Plaintiffs' contention that Edmond's intermediate force policy was deficient, and that the deficiency establishes a *Monell* failure to train claim.[4] Edmond's Weapons Policy and Procedure #07-02 states that "[o]fficers while in uniform shall at minimum carry less lethal options of authorized baton, O.C. or an electronic control device on their duty belt during any patrol assignment."[5] Plaintiffs, through Professor Gilbertson, argue that Edmond's policy is deficient because it fails to "*require*[] its officers [to] carry *all issued intermediate force weapons on their person.*" Doc. No. 83-11, p. 26 (emphasis added). Specifically, Professor Gilbertson opines that

> [b]y not requiring officers to carry less lethal department-issued use of force weapons/tools, [Edmond] knowingly limits the use of force its officers can employ. An officer who carries only one less lethal weapon only has deadly force in the form of their firearm available as a weapon if the one other less lethal weapon is unusable for any reason. That is precisely what happened according to Officer Scherman.

*Id.* Edmond responds that Plaintiffs "ignore the undisputed fact that three (3) attempts at using non-lethal force to detain [ ] Lewis failed." Doc. No. 87, p. 7. However, Professor

---

[4] The Court notes that though the Plaintiffs couch their allegations in terms of a "failure to train" claim, the Plaintiffs actually allege that the City's policy is deficient, rather than that the officers were inadequately trained.

[5] Edmond Police Department Weapons Policy and Procedure #07-02, p. 7 ¶ IV(A).

Gilbertson asserts that had Edmond required officers to carry all intermediate force weapons and had Scherman complied with such policy, Scherman would have had additional less lethal options to subdue Lewis than first resorting to his firearm if his taser failed. Doc. No. 83-11, p. 26.

Though the Plaintiffs do not point to a pattern of excessive force employed by Edmond, the Supreme Court has "left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63. As the Court explained above, this pattern is unnecessary when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that the municipality can be charged with being "deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. In *City of Canton*, the Supreme Court explained that training officers on the use of deadly force can be said to be "so obvious, that the failure to do so could properly be characterized as deliberate indifference." *Id.* at 390 n.10 (internal quotation marks and citations omitted). Thus, the question for the Court is whether it is "so obvious" that Edmond's intermediate force policy—requiring an officer to carry only one less lethal tool—is so likely to be inadequate that Edmond can be charged with being "deliberately indifferent."

"In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton*, 489 U.S. at 392. In *City of Canton*, the Supreme Court explained, however, that federal courts are "ill suited

to undertake" an "endless exercise of second-guessing municipal employee-training programs." *Id.* Rather, the role of the district court is to identify whether the municipality had actual or constructive notice of its purported failure to train or whether the alleged failure to train is one of the "rare cases" in which the necessity of the training is "so patently obvious" that the municipality could only avoid notice if it was deliberately indifferent to the necessity of the training. *See Connick*, 563 U.S. at 64.

In *Davis v. City of Tulsa, Oklahoma*, 380 F. Supp. 3d 1163, 1175 (N.D. Okla. 2019), the plaintiff's expert argued both that "the City of Tulsa failed to provide proper scenario-based deadly force training or 'shoot-don't shoot' training" and "that the City should have required [its officers to be equipped] with less-lethal weapons such as Tasers." 380 F. Supp. 3d at 1175. The court, relying on the Tenth Circuit's decision in *Castle*, explained that the failure to "provide particular 'shoot/don't shoot' training where officers are confronted with non-lethal weapons" did not provide evidence of "how the City had notice that its actions (or failures to act) were likely to result in constitutional violations" nor "illustrated how the City consciously chose to disregard the risk of harm." *Id.*, quoting *Carr v. Castle*, 337 F.3d at 1221. Similarly, here, the Plaintiffs have not provided any evidence of a pattern of constitutional violations or any other indication that Edmond was, or should have been, on notice that its intermediate force policy was constitutionally deficient. Further, Plaintiffs' expert's assertion that the policy was deficient, by itself, does not establish that the intermediate force policy is one of the "rare cases" where the training's necessity is "so

patently" obvious that Edmond must have been deliberately indifferent to the need for amending its policy.[6]

Thus, the Court finds that Plaintiffs have not shown Edmond was deliberately indifferent in the adoption of its intermediate force policy.[7] Accordingly, Edmond's motion for summary judgment is hereby GRANTED on the failure to train claim.

## V.    Equal Protection Clause

Edmond also seeks summary judgment on Plaintiffs' equal protection claim. Under the Fourteenth Amendment, "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In *Village of Willowbrook v. Olech*, the Supreme Court explained that "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v.*

---

[6] In *Davis v. City of Tulsa, Oklahoma*, 380 F. Supp. 3d 1163, 1177 (N.D. Okla. 2019), the Court analyzed other appellate decisions and explained that

> Some of the federal appellate courts have rejected the less-lethal weapons theory of municipal liability. *See, e.g., Carswell v. Borough of Homestead*, 381 F.3d 235, 245 (3d Cir. 2004) ("we have never recognized municipal liability for a constitutional violation because of failure to equip police officers with non-lethal weapons"); *Plakas v. Drinski*, 19 F.3d 1143, 1150-51 (7th Cir. 1994) (rejecting claim that a county violated a suspect's constitutional rights by failing to equip its police officers with alternatives to deadly force, stating "we think it is clear that the Constitution does not enact a police administrator's equipment list"); *see also generally Salas v. Carpenter*, 980 F.2d 299, 309-310 (5th Cir. 1992) (determining that the Constitution does not "mandate that law enforcement agencies maintain equipment useful in all foreseeable situations"); *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) ("The Fourth Amendment does not require 'the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable under *Tennessee v. Garner* and *Graham v. Connor*....") (quoting *Plakas*, 19 F.3d at 1149).

380 F. Supp. 3d at 1175.

[7] The Court need not address whether the Plaintiffs met the "direct causal link" element of a failure to train claim because the Court finds that Plaintiffs have not shown Edmond was deliberately indifferent.

*Olech,* 528 U.S. 562, 564 (2000) (internal citation omitted). Thus, to prevail under *Olech,* Plaintiffs must show that the police intentionally treated Lewis differently from others similarly situated. *See id.*

Plaintiffs argue that Lewis, a black 17-year-old, "was treated differently from others not of his race who were similarly situated to him in other encounters with the City's police officers." Doc. No. 83, p. 20. Specifically, Plaintiffs point to an encounter in June of 2019 between one Edmond police officer, two University of Central Oklahoma officers, and a 19-year-old white suspect. *Id.* The Plaintiffs argue that Lewis was "wrongfully treated" differently because in June of 2019, the officers successfully tased, restrained and took into custody the 19-year-old white suspect without resorting to deadly force while the Defendants encounter with Lewis ended in his death. Doc. No. 83, p. 21.

Edmond argues that summary judgment is appropriate because the June 2019 encounter is not "evidence of others who were similarly situated." Doc. No. 87, p. 8. "The Equal Protection Clause does not forbid differential treatment per se; rather, '[i]t simply keeps governmental decision makers from treating differently persons *who are in all relevant respects alike*.'" *Wheeler v. Perry*, No. CIV-15-198-F, 2015 WL 5672607, at *8 (W.D. Okla. Aug. 21, 2015) (citing *Taylor v. Roswell Ind. Sch. Dist.,* 713 F.3d 25, 53–54 (10th Cir. 2013) (internal quotation marks omitted), *report and recommendation adopted,* 2015 WL 5686587 (W.D. Okla. Sept. 24, 2015)) "Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004).

In *Jennings*, the Tenth Circuit explained the practical application of the Supreme

Court's decision in *Olech* by stating that

> Plaintiffs will have an easier time stating a claim where there are few variables in play and the set of potentially similarly situated individuals is well-defined. This is the key to understanding *Olech.* There, the village asked for a standard fifteen-foot easement from everyone (other than the Olechs) who had requested a hookup to the municipal water supply, without regard to differences in cost or circumstance. When the village demanded a larger easement from the Olechs, with no apparent legitimate reason for the difference, the Court was willing to recognize an equal protection claim.

> When multiple variables are in play, however, the difference in treatment can be the product of a number of considerations, conscious or otherwise, many of them legitimate. That is why the Supreme Court has imposed a substantially more "demanding" pleading burden on plaintiffs bringing claims of selective law enforcement. *United States v. Armstrong,* 517 U.S. 456, 463–64, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1995).

383 F.3d at 1214.

Here, Plaintiffs argue that the 19-year-old white suspect was similarly situated to

Lewis because both individuals were in an altered mental state, broke through the door of

a home, and ignored commands from officers. Doc. No. 83, pp. 20–21. However, the

undisputed facts reveal the individuals were not similarly situated for several relevant

reasons. First, two of the three responding officers were not Edmond police officers.

Second, the parties do not dispute that Sergeant Box's multiple attempts at deploying his

taser did not affect Lewis. Doc. No. 65, pp. 12–13 ¶¶ 39, 42, & 44; Doc. No. 82, p. 12, ¶¶

39, 42, & 44. Conversely, the second taser deployment successfully subdued the suspect in

the June 2019 incident. Doc. No. 64, pp. 9–10 ¶ 7.[8] Lastly, while Lewis "continued to strike Box to the point where Box" felt he may go unconscious, there is no evidence any officer engaged in close combat with the suspect in June of 2019.

Further, the Plaintiffs fail to include any evidence of discriminatory intent. The Plaintiffs state that the failure to use de-escalation or other techniques with Lewis also "occurred on other occasions involving individuals experiencing a mental health crisis." Doc. No. 83, pp. 8–9.

Thus, even construing the facts in favor of the non-movant, Plaintiffs fail to allege that Lewis was treated differently than other similarly situated suspects because Plaintiffs do not identify other persons who were *in all relevant aspects like him. See Roswell*, 713 F.3d at 53. Nor do Plaintiffs offer evidence of discriminatory intent towards Lewis. For these reasons, there is insufficient evidence of race discrimination to withstand Edmond's summary judgment motion. Accordingly, Edmond is entitled to summary judgment on Plaintiffs' equal protection claim.

## VI.    State Law Negligence Claim

In regard to the state law negligence claim, Edmond argues that it is entitled to summary judgment because "when a court finds that an officer's actions were 'objectively reasonable' in granting summary judgment on a § 1983 excessive force claim based on qualified immunity, summary judgment should likewise be granted in favor of a

---

[8] The evidence offered by the Plaintiffs states that a second taser deployment successfully subdued the 19-year-old white suspect. *See* Josh Dulaney, *Some see race at play in Edmond police tactics*, The Oklahoman (June 25, 2019), https://www.oklahoman.com/article/5634694/some-see-race-at-play-in-the-difference-with-edmond-police-tactics.

municipality on a state law negligence/excessive force claim." Doc. No. 64, p. 35 (citing *Hodge v. Keene*, No. CIV-10-1283-D, 2013 WL 372460, at \*10 (W.D. Okla. Jan. 30, 2013)). However, as discussed above, the Court declines to grant summary judgment on the Plaintiffs' excessive force claim against Officer Scherman. Accordingly, the Court also declines to grant summary judgment on the state law negligence claim against Edmond.

## VII.   Conclusion

In summary, Sergeant Box's motion for summary judgment is GRANTED, Officer Scherman's motion for summary judgment is DENIED, and Edmond's motion for summary judgment is GRANTED IN PART and DENIED IN PART, as set forth herein.

**IT IS SO ORDERED** on this 6th day of July 2021.

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**